## Richmond

VERNIA JUSTICE, ET ALS. V. PANTHER COAL COMPANY, INC.

April 10, 1939.*

Record No. 2076.

Present, All the Justices.

---

*Rehearing refused June 14, 1939.

The opinion states the case.

*W. Clyde Dennis* and *S. H. & Geo. C. Sutherland,* for the appellants.

*Bandy & Bandy,* for the appellee.

HUDGINS, J., delivered the opinion of the court.

This appeal brings under review an order of the Industrial Commission, declaring that pneumonia, the direct and immediate cause of the death of L. E. Justice, did not result naturally and unavoidably from injuries sustained in an accident arising out of and in the course of employment.

The uncontroverted facts are: On February 22, 1938, L. E. Justice was caught under a fall of slate in the mines of the Panther Coal Company. It took some 45 minutes to get him out of the mine, on a stretcher, and down the moun-

tain to Dr. Sanders' office. An examination disclosed that the injured man was suffering intense pain from shock, and a fracture of the pelvis on the left side. He was perspiring freely and his skin was clammy. He was given first aid treatment, and sent in a closed car to the hospital at Richlands, some 52 miles away. The weather was very cold, and there was a drizzling rain. It was determined by the physicians at the hospital that the administration of ether was necessary in order to attempt the reduction of the fracture. This was done on February 24. On February 27 the patient developed pneumonia. On March 3 he became delirious, and died at 12:30 a. m., March 4.

These facts are sufficient to convince the lay mind of the causal connection between the accident, injury and death. However, the Commission, apparently basing its conclusion on the medical testimony, held that the causal connection was not established, and denied the widow and dependent children compensation.

There is no material conflict in the testimony of the five doctors who were introduced as witnesses. An epitome of their testimony is: The direct and immediate cause of death was acute lobar pneumonia. This type of pneumonia is contagious and in a majority of cases is spread by "pneumococcus carriers," persons who themselves may or may not have had pneumonia, but the secretion of whose nose and mouth for weeks and months contain many virulent pneumococci. A week or more after some friends and kinsmen visited decedent in the hospital, several had pneumonia which was fatal to one. None of the doctors ventured to express an opinion as to the time or source from which the decedent contracted pneumonia. It had developed to such an extent that its symptoms were apparent on February 27, the third day after the operation. The incubation period of the disease is usually from one to two days, sometimes longer. Each doctor stated positively that the shock of the breaking of the pelvis bone and the operation itself so weakened the general resistance of the victim as to make him very susceptible to the development of the germ.

The doctors further agreed that following the administration of ether there is always danger of pneumonia developing in the patient. The medical testimony, considered alone, is vague, but when weighed with the conceded facts, it strengthens rather than weakens claimants' contention that the accident was the starting link in the chain of causation ending in death.

There is no proof, but merely a suggestion that possibly the decedent was a carrier of pneumococci. But, even if we accept the suggestion as proof, claimants are entitled to compensation if the accidental injury so influenced the progress of an existing disease as to cause death.

In *Winchester Milling Corp.* v. *Sencindiver*, 148 Va. 388, 395, 138 S. E. 479, 481, we said: "Whatever view we take of the medical opinions, they are frankly, and at best, but theories, but taking them as they are, in connection with the facts heretofore narrated, and taking a common sense, practical view, as courts and commissions must take of the ordinary happenings of life, boiled down to its last analysis the medical theory is that there is a relationship between the receipt of injury and origin of sarcoma, and that the degree of injury plays no important part. With this in mind we find a perfectly healthy, strong man who has never lost any time from work or complained of any illness, suffers an injury and from that time on is incapacitated, grows worse and worse, sarcoma develops at the point of injury, from which he dies. The lay mind, under such circumstances, can reach no other conclusion than that reached by the Commission, viz: that the sarcoma was either caused by the injury or was aggravated by it.

    \*      \*      \*      \*      \*      \*      \*

" 'The general rule clearly to be adduced from the decisions in this type of case is that if the facts show a causal connection between the injury and the development of cancer, then the two cannot be separated, and the victim of the cancer is entitled to compensation.' "

The causal relation between trauma and the type of pneumonia now under consideration is discussed in "The Relation

Between Injury and Disease," by Reed and Emerson. At page 18 it is said: "Pneumonia of all types explains many (some say fifty per cent) of all deaths which follow operations on patients who previously had seemed excellent surgical risks. When ether was in vogue, such cases of pneumonia often were termed ether pneumonia; but they occur also when other general, and also when local, anesthetics are used. The supposition is that the patients who, following an operation or trauma due to accident, develop acute lobar or lobular pneumonia were themselves carriers at the time of the injury or happened then to be exposed to a pneumococcus carrier; and that the pneumonia developed since some feature of the operation or accident had reduced the susceptibility of the lungs to that germ. The incubation period of these post-traumatic cases usually is only one or two days, while that of the spontaneously developing pneumonias lasts as a rule for seven or eight days. The course of these two groups of cases, however, is the same.

\* \* \* \* \* \* \*

"By way of summary, it may be repeated that several types of pneumonia occasionally follow trauma to (or operation on) the chest wall or to any other parts of the body. Of these are: acute lobar pneumonia and acute lobular pneumonia, enabled to develop because the patient's general resistance to the pneumococcus (which he had been carrying in his throat or happened then to inhale) had been sufficiently lowered by the injury or operation; \* \* \* .

"But finally, it should be emphasized that many cases diagnosed post-traumatic or postoperative pneumonia are not pneumonia at all. Many of them are cases of simple pulmonary infarction without secondary infection; of massive collapse of the lung; or of developing lung abscess. In any event, however, the pneumonia, of whichever type it may be, and also any pulmonary infarct, lung abscess, and pulmonary collapse which follows an injury, must be recognized as post-traumatic in origin; that is, as due to the injury which it followed."

Other authorities are in accord with the foregoing statements.

In *Bethlehem Steel Co.* v. *Traylor,* 158 Md. 116, 148 A. 246, 73 A. L. R. 479, it was held that if pneumonia, which was the immediate cause of death, was induced or accelerated as the proximate result of poisoning, the claimant was entitled to compensation, even if the victim was suffering with a tubercular lesion, or chronic bronchitis at the time of the injury.

In *Lockhart* v. *State Compensation Commissioner* (1934), 115 W. Va. 144, 174 S. E. 780, it was held that causal connection had been established where decedent, in the course of employment, contracted paint poisoning which so weakened and debilitated his condition that acute septicemia developed and was the direct and immediate cause of death.

Claimants are entitled to compensation when it has been established that the employee's death resulted from latent tuberculosis which had been aggravated and "caused to flare up" as a result of a compensable trauma. "Tuberculosis may be caused by trauma or a latent case thereof may be aggravated and caused to become active thereby." *United States Fidelity & Guaranty Co.* v. *Maddox* (1935), 52 Ga. App. 416, 183 S. E. 570, 571.

An accident to an employee, which sets in motion his undeveloped and dangerous physical condition with mortal consequences, is properly classable as the proximate cause of the fatality. *Furferi* v. *Pennsylvania R. Co.,* 117 N. J. L. 508, 189 A. 126. *Geizel* v. *Regina Co.,* 96 N. J. L. 31, 114 A. 328; *Winter* v. *Atkinson-Frizelle Co.,* 88 N. J. L. 401, 96 A. 360; *Voorhees* v. *Smith Schoonmaker Co.,* 86 N. J. L. 500, 92 A. 280; *Lundy* v. *George Brown & Co.,* 93 N. J. L. 469, 108 A. 252; *Bernstein Furniture Co.* v. *Kelly,* 114 N. J. L. 500, 177 A. 554; and *New York Live Poultry Trucking Co.* v. *Schwartz,* 5 N. J. Misc. 178, 135 A. 775.

The general rule, deductible from these and other authorities, is that causal connection is established when it is shown that an employee has received a compensable injury which materially aggravates or accelerates a pre-existing

latent disease which becomes the direct and immediate cause of death. Schneider's Workmen's Compensation Law, 2d Ed., section 138, and cases cited in footnote. Note 20 A. L. R. 66.

█ Decedent was hale and hearty for several years immediately preceding the accident. He was never sick during this period. After the accident, exposure and operation, he was confined to the hospital where we presume all proper precautions were taken to prevent the onslaught of pneumonia from any source. Notwithstanding these precautions, pneumonia developed in an otherwise apparently vigorous and healthy man within five days from the date of the accident and within three days from the date ether was administered, resulting in death some five days later. In the absence of positive affirmative evidence, tending to establish a break in the chain of causation, the inevitable conclusion from the evidence is that the death of the decedent resulted "naturally and unavoidably from the accident."

For the reasons stated, the order of the Industrial Commission is reversed, and the case is remanded to it with the direction to allow claimants the amount of compensation allowed by law.

*Reversed and remanded.*

GREGORY and BROWNING, JJ., dissenting.

BROWNING, J., dissenting.

I am unable to agree with the position of the majority, and therefore I submit the following observations as embracing my views herein:

L. E. Justice, the claimant's deceased, was injured by an accident, arising out of and in the course of the employment, on February 22, 1938, while working at an average weekly wage of $22.30. The nature of the injuries was described as a "fracture of the left ilium extending down

to the acetabulum." The accident was caused by a fall of slate in the mine of the appellee.

The injured man was brought out of the mine, and carried down an abrupt incline to the office of the physician for the company. It required forty-five minutes to travel the distance to the doctor's office. The weather was cold and it was raining. A blanket was used to cover the injured man in traveling the distance. He was examined by the physician, who directed that he be taken to the Mattie Williams Hospital at Richlands, Virginia, a distance of 52 miles. The trip was made in a closed automobile.

The fracture was reduced on February 24, 1938. In the reduction ether was employed, pneumonia developed on February 27, 1938, and the patient died on March 4, 1938, at 12:30 a. m.

We quote from the opinion of the Hearing Commissioner Nickels, which was adopted by the full Commission:

"The claim is based upon the theory that the administration of ether gave deceased pneumonia. The defendant alleges that death resulted from natural causes.

"The record shows no symptoms of a cold or elevation in temperature, due to shock or exposure, while deceased was being transported from site of accident to the hospital. The hospital record shows a normal temperature on the day of the operation for reduction of the fracture. The first signs of pneumonia developed on February 27, 1938, a period of 3 days after administration of the ether. The medical evidence shows that the type of pneumonia occasionally following the administration of ether usually develops thereafter in from 24 to 36 hours.

"The record shows that this type of pneumonia develops from mucus congesting in the lungs. It is not of the germ type. On the other hand, the record shows cause of death to have been lobar pneumonia of the pneumococcus type, A-B, which is of a contagious character and very dangerous to human life. Therefore, the record shows this type of pneumonia to be direct cause of death.

"From the record it is apparent that the administration of ether did not cause the pneumonia. The only inference of fact compatible with the record is that the germ was already present and that pneumonia developed coincidentally during the period of hospitalization for the fracture. It is equally probable that the pneumonia would have developed independently of the accident. Good reasoning would indicate that a weakened body from the accident would, no doubt, be a contributing factor to death from pneumonia.

"The disease condition having been the proximate cause of death, and the accident not having been a producing cause thereof, the case is dismissed from the docket, each party paying its respective costs."

We think that the above is a fair and accurate statement of the case as shown by the record.

Five physicans testified and not one of them was positive as to the cause of the disease, pneumonia, which resulted in the death of the employee. The only medical testimony on that point is found in the examination of the company's physician, Dr. U. O. Sanders, who said that pneumonia would not develop from exposure alone in the case of a person who was otherwise healthy.

The claimant urges that the testimony creates a doubt as to the principal issue and that where such is the case it should be resolved in her favor. If this court should approve and adopt that contention in this case, it would ignore the paramount requisite in every case, namely, that the plaintiff must make out his case, i. e., he must prove it by a preponderance of the evidence. Here the evidence leaves us in a maze of surmise and conjecture as to what did cause the pneumonia, of which the employee died. No casual connection between the accident and the disease is shown and, that being true, an inhibition of the statute applies, which is found in Virginia Code, section 1887 (2), subsection (d) and reads:

" 'Injury' and 'personal injury' shall mean only injury by accident arising out of and in the course of the employ-

ment and shall not include disease in any form, except where it results naturally and unavoidably from the accident."

It is suggested that the case is controlled by the case of *Bristol Builders Supply Co.* v. *McReynolds,* 157 Va. 468, 162 S. E. 8, 9. This court, in that case, through Campbell, Chief Justice, said: "The sole question in this case is whether or not the claimant's deceased died of septic pneumonia. If death did result from septic pneumonia, claimant is entitled to compensation; otherwise she is not."

As to this issue the attending physicians were in doubt but the Commission called three disinterested physicians, to whom the question was propounded in hypothetical form and their answer was: "We feel from the question as stated that it was septic pneumonia, probably due to the injury." Thus their testimony was positive in its response to the question which was determinative of the issue as declared by the court.

There is no positive testimony here as to the decisive issue; this being so, the award of the Commission and its finding of facts should, in my judgment, be determinative of the case.

In the case of *Old Dominion Land Co.* v. *Messick,* 149 Va. 330, 141 S. E. 132, we held that the disease must be due to the injury to warrant an award in favor of the claimant. That is far from having been shown in this case.