# Richmond

CHARLES L. ELLIS, III v. COMMONWEALTH OF VIRGINIA, DEPARTMENT OF HIGHWAYS.

January 24, 1944.

Record No. 2750.

Present, Campbell, C. J., and Gregory, Browning, Eggleston and Spratley, JJ.

The opinion states the case.

*Caskie, Frost & Watts*, for the appellant.

*Abram P. Staples, Attorney General*, and *Walter E. Rogers, Assistant Attorney General*, for the Commonwealth.

SPRATLEY, J., delivered the opinion of the court.

We have under review an order of the Industrial Commission denying the appellant, Charles L. Ellis, III, compensation for the loss of a leg, which disability is claimed by the appellant to have resulted from an accident arising out of and in the course of his employment.

The evidence was first heard by the hearing commissioner on August 15, 1942. It was then agreed that employee and

employer might subsequently file the reports of physicians in relation to the case, with the right of counsel for each of the parties, if they desired, to cross-examine the physicians.

Accordingly, reports of Doctors M. M. Ralston and J. N. Reeves were filed on behalf of the claimant and Dr. John S. Howe on behalf of the employer. Also introduced was a letter from Dr. C. E. Watkins to the Claims Adjuster of the State Highway Commission.

On November 24, 1942, seven days after the report of Dr. Howe had been filed, and before counsel for the claimant had an opportunity to cross-examine Dr. Howe, the hearing commissioner entered an order denying compensation. An appeal to the full commission was noted, and although attention was directed to the fact that no opportunity had been given for the cross-examination of Dr. Howe, the commission reviewed the case without giving such opportunity and affirmed the hearing commissioner on March 1, 1943. Upon the continued insistence of the claimant of his right to cross-examine Dr. Howe, the commission granted a supplemental review, and Dr. Howe was thereupon placed on the stand and examined by appellant's counsel. Thereafter, on May 17, 1943, the commission affirmed its previous decision.

Charles L. Ellis, III, a well developed and well nourished boy, nineteen years of age, started to work with the State Highway Commission of the Commonwealth of Virginia on August 1, 1941, directly under the supervision of H. K. Hunsberger, senior highway engineer.

In September and October, 1941, Ellis had an infection of his right forearm following a small furuncle or boil. The infection localized after some time, and cleared up after a series of multiple small boils involving the entire right forearm. He ran some temperature, but responded well to treatment according to his physician, Dr. Watkins. He secured sick leave from his work on September 1st, and did not return to it until about September 18th. When he returned, he complained of a dull aching pain in his left knee and, perhaps, some in the right knee. The pain was described by Dr. Watkins as being of a "vague rheumatoid type, with no

external evidence of anything, such as swelling, tenderness, fluid. etc." Ellis thought he was suffering from rheumatism. At any rate, he says the pain in his leg cleared up under treatment, and that his physical condition was completely corrected by November 1, 1941.

On December 5, 1941, Ellis went out to work with other employees on route 250, just east of Waynesboro. On that day he was working on a highway cut beside a steep and rocky hill. In the course of his work, it started to rain, and while he was going down the hillside, loose rock from above began to roll down the side of the steep bank, one of the rocks striking his left leg on or near the knee. The blow was sufficient to cause him to slip and fall on his stomach as he endeavored to keep from falling all the way down the hill. He then thought his injury was a minor one, although the bruise on his knee was severe and accompanied by pain. The pain temporarily left him, but subsequently returned.

The next day it was raining, and he did not work until the following day. While the knee had become painful he still did not attribute it to the blow, and consequently he made no report of the accident to his employer. He kept on with his work until December 21st, although he continued to have some soreness about the knee, with a gradual increase in swelling and an associated increase in pain. On the latter date, he applied for a vacation, rather than sick leave, for the purpose of going to a hospital to find out what was causing the trouble in his knee.

He went to West Virginia, where his mother resided, and was there admitted to a hospital on December 26th. On physical examination, his physicians noticed that he walked with a decided limp, shielding the left leg. There was "some swelling below the knee joint, and marked tenderness of the medial aspect of the proximal end of the tibia. This area was somewhat spongy to palpitation."

After a thorough and critical examination, including the use of X-ray, his physicians state "the proximal end of the tibia of the left leg was exposed and bone opened and thor-

oughly curetted." In this operation, "No evidence was found of any purulent material but a large amount of highly vascular tissue resembling brain substance with definite bone destruction in a small area in proximal end of the tibia. A pathological study was made of the tissue removed, including periosteum, bone, and new growth, and found to be a chondro-sarcoma."

Ellis was then advised that amputation of his left leg was necessary to save his life. On December 31, 1941, his left leg was amputated at a point slightly above the knee.

The claimant testified that he had his mother write the highway department of his injuries when their extent was realized.

Hunsberger testified that Ellis was transferred to work under S. A. Hays, another engineer, on November 15, 1941, and that the transfer was made because he observed that claimant's knee was in such condition that he could not do the same work as other employees with good legs; that he was aware of the infection on claimant's arm; and that when Ellis returned after treatment for the arm infection, he noticed a decided limp which continued up to November 15th.

Hays testified that on account of the apparent lameness of the appellant, when he reported to him on November 15th, he limited the nature of his work; that he first assigned him the duty of holding a safety sign in his hand on the road; but that thereafter he assigned him duties which made it necessary for him to climb the bluff with other employees; and that he thought the latter work and exercise would be beneficial in limbering up his leg. He granted Ellis vacation leave on December 21st, without any notice of an accident to him while working on the hillside. Claimant's mother wrote him while her son was in the hospital, asking for some assistance, and he referred the matter to the proper authorities. After the operation, claimant told him he did not report the accident at the time because "I thought it was so slight it wasn't necessary." This witness could not state which leg was involved.

There is no history of any other injury to the leg of Ellis other than the injury inflicted by the stone. Some slight inconsistencies in the evidence with respect to the date of the accident and the nature of its happening are, we think, either immaterial or explained by the circumstances.

Ellis was attended by two experienced and competent physicians. Dr. J. N. Reeves had been chief surgeon at the hospital for three years and formerly superintendent and chief surgeon of another hospital for four years. Dr. Ralston had specialized in traumatic and orthopedic surgery for six years, and has been a special examiner for the West Virginia Compensation Commission for six years. Dr. Ralston assisted Dr. Reeves in the examination, diagnosis, operation, and subsequent treatment of Ellis.

Dr. Reeves, in his report, after setting out the history of the case and fully describing the physical condition of Ellis and his left leg, stated that he had been informed of the testimony before the Industrial Commission herein related, both with respect to the arm infection in September and October and of the statements of Hunsberger and Hays, and, in view of all the circumstances and conditions disclosed by the X-ray and laboratory tests and the testimony, he was definitely of the following opinion:

"1. That the prior arm infection and the trouble in the knee or knees in conjunction therewith, whether the same had cleared up prior to the time the knee of Mr. Ellis was struck by a rock or not, has no bearing on the diagnosis and condition found involving the left knee. The trouble was sarcoma and so far as I know in medical profession, infection is not considered the cause of sarcoma.

"2. That the condition which developed at the site of the left knee was a direct result of the injury from the rock and that previous infection had no bearing on same.

"3. That the blow on the leg was the sole cause of the trouble, which subsequently developed and necessitated the amputation of his leg.

"4. That the previous arm infection and trouble in his knees could under no reasonable probability have caused the final trouble which resulted in the amputation of the thigh.

"5. In my judgment it is a well established and recognized fact in the medical profession that trauma, especially occurring to young people, is the sole cause of many malignancies developing shortly thereafter and that the result which followed in the instant case is a common one and which might well have been expected and which would have happened regardless of the arm infection which apparently entered into the blood and caused the trouble with the knee or knees and was thus totally disassociated from the sarcoma which resulted from the blow on the knee."

Dr. Ralston made the following report:

"I was in attendance on Mr. Ellis during his stay in the Oak Hill Hospital and the operation and subsequent treatment, and I also concur in the opinion expressed by Dr. Reeves in his statement, to the effect that the sarcoma which developed in the left leg of Mr. Ellis came solely and only from the blow on the knee and was in no way effected by any previous arm infection and resulting knee trouble therefrom, whether such infection and any trouble had cleared up prior to the accident complained of or not. I am also of the opinion that ordinary infections which affect the blood stream, which apparently happened in the case of Mr. Ellis, is not a cause of sarcoma and that the condition of Mr. Ellis necessitating the amputation of his leg, was not caused directly or indirectly by any previous arm infection or resulting trouble therefrom in his knees.

"It is recognized, particularly in young people, that malignancy frequently results from bruises, and that such result is in no way unusual. I have been informed of the testimony before the Industrial Commission, as set out in the statement of Dr. Reeves, and whether the testimony of Mr. Ellis or of the State Highway Department foreman be accepted, it would in no way change my diagnosis and conclusions as set out above."

The evidence in the case, together with the reports and opinions of Doctors Reeves and Ralston, was submitted to Dr. Howe, who qualified as an expert pathologist. Dr. Howe expressed the opinion that the general statements in the conclusions of Doctors Reeves and Ralston were not sustained by the leading authorities on bone sarcomas. He qualified his opinion, however, by saying:

"In order to evaluate the case accurately on its merits, it would be helpful to have more definite information on the size of the tumor in the X-ray and at the time of operation as well as to review the slides made from the tumor, since the course of a bone sarcoma may vary according to the histolgic type."

Accepting the diagnosis of chondro-sarcoma and the description by Dr. Ralston of the amount of tumor removed at the time of the operation, he further said:

"In my opinion the mere history of trauma is not sufficient to presume that it is the cause of a bone sarcoma which subsequently developed. There are at least three possible explanations which might be given of the association between trauma and bone sarcoma. First, the trauma may simply have called attention to a tumor of bone which had previously existed. Second, the relationship may be entirely coincidental with no causal relationship. Third, perhaps in a small percentage of cases the trauma may actually cause the bone sarcoma or may accelerate the growth of a sarcoma already existing. In my opinion each case must be judged on its merits and not on generalities which are not sustained by the best medical opinion."

He then added:

"It seems more probable that the pain which was present in the knee from about October and caused fairly constant limping according to the testimony, was due to an early tumor actually present at that time."

In supporting his opinion he quoted from the following medical treatises, which, in part, state:

"The etiology of bone sarcoma is highly obscure. All varieties of sarcoma have been attributed to trauma, but it is

evident that the injury is only one of several essential factors." Ewing's Neoplastic Diseases, 4th Edition, page 314.

"Persistent, increasing, and unexplained pain is the most significant and earliest symptom in nearly all cases and calls for a provisional diagnosis of osteogenic sarcoma." Id., page 305.

"The symptoms in primary chondro-sarcoma have usually existed for about five months before examination, and begin with a complaint of pain which may or may not follow a relatively mild form of trauma. The pain becomes rapidly more constant and severe and soon interferes with function of the part. Weight-bearing in the affected leg soon becomes painful and limp is followed by the use of crutches." Geschickter and Copeland in Tumors of Bone, 1st Edition, page 102.

"Chondro-sarcoma is a bulky hard tumor of slowly progressing course." Bell's Textbook of Pathology, 4th Edition, page 284.

He concluded that the evidence failed "to show a definite relationship between the trauma and the development of the chondro-sarcoma." He thought the described size of the tumor and "the very short period of time elapsing between the trauma and the diagnosis of a well defined chondro-sarcoma makes existence of any relationship very unlikely.' He agreed with Doctors Reeves and Ralston that there was no relation between the previous arm infection and the development of the sarcoma.

The hearing commissioner did not specifically, and separately from his conclusion of law, make a finding of the facts. He set out all of the evidence, and adopted the opinion of Dr. Howe as the basis of his decision.

The full Commission, on March 1, 1943, on review also accepted the conclusion of Dr. Howe, and held that "The claimant failed to establish an accident or causal connection between the alleged accident and the development of the tumor, either directly as a cause or by aggravation thereof."

The Commission having granted a supplemental review for the purpose of permitting examination of Dr. Howe, the latter presented himself for such examination on April 20, 1943.

Dr. Howe then testified that the medical profession had never been able to discover any one specific and exact cause of cancer; that trauma, while not a common cause, was recognized as one of the factors in its origin and development; and that a pre-existing cancer might be aggravated or accelerated by a blow. He admitted that, here, the clearing up of the pain prior to the accident did not follow the usual course attendant upon a sarcoma, since in sarcoma the most significant symptom is a pain which becomes rapidly more constant and severe, according to the cited authorities. He explained that the authorities dealt with the normal course and that other conditions "are not unheard of, it being possible that a disease might take a different course and a condition become better instead of worse." He stated that he accepted the findings of Doctors Reeves and Ralston as to the diagnosis and that the size of the tumor was the only information upon which he based his opinion.

The Commission thereupon reaffirmed its decision of March 1, 1943, and dismissed the claim of the appellant.

We are not here confronted merely with the finding of questions of fact based upon conflicting testimony. There is little or no conflict upon ascertainable facts. The only apparent conflict is between the conclusions of medical experts, based upon a set of circumstances, which were more fully developed before those taking one view than before another supporting an opposite view. Here the two attending physicians, thoroughly familiar with all of the conditions, expressed definite positive opinions; while another physician, giving a theoretical opinion, admitted that he could be more accurate if he were in possession of more definite information of the conditions existing at the time of the operation.

In many respects, this case is similar to. *Winchester Milling Corp. v. Sencindiver*, 148 Va. 388, 138 S. E. 479,

where it was held that the death of the employee resulted from a sarcoma which was either caused or aggravated by an injury to his ribs suffered in a fall. The medical testimony in that case was conflicting as to whether the injury had any causal connection with the sarcoma. There we were faced with inconsistent opinions of physicians; nevertheless, we found that it was impossible to separate the occurrence of the injury from the condition of disability which resulted. Having in mind that the purpose of the Compensation Act is to protect the employee, and that it should be construed liberally and favorably as to the workman, we took a common sense practical view of the facts and accepted the medical theory "that there is a relationship between the receipt of injury and origin of sarcoma, and that the degree of injury plays no important part."

See also *Slemba* v. *Hamilton & Sons*, 290 Pa. 267, 138 A. 841, and cancer cases cited in annotations in 20 A. L. R. 23, and 73 A. L. R. 498.

In *Justice* v. *Panther Coal Co.*, 173 Va. 1, 2 S. E. (2d) 333, we drew the ordinary conclusions of cause and effect from established facts as opposed to indefinite and uncertain facts, and held that "causal connection is established when it [has been] shown that an employee has received a compensable injury which materially aggravates or accelerates a pre-existing latent disease, which becomes a direct and immediate cause" of his disability.

"The general rule is that when an attending physician is positive in his diagnosis of a disease, great weight will be given by the courts to his opinion." *Bristol Builders Supply Co.* v. *McReynolds*, 157 Va. 468, 162 S. E. 8.

In *Byrd* v. *Stonega Coke, etc., Co.*, ante, p. 212, this day decided, we have committed ourselves to the rule that when a healthy, strong employee suffers a physical injury, in the course of and arising out of his employment, which is followed by a serious disability, and competent physicians attribute the disability to the injury, and only probable or conjectural reasons are assigned by other physicians

to explain the disability on grounds other than the injury, the presumptions should be resolved in favor of the employee.

If there be any fair doubt about the facts, they should be resolved in favor of the claimant. *Scott* v. *Willis*, 150 Va. 260, 142 S. E. 400.

The cases of *Carter* v. *Hercules Powder Co.*, *ante*, p. 282, and *Hubbard* v. *Dan Valley Mills*, *ante*, p. 223, both this day decided, are not in conflict with the views expressed herein.

In the *Carter Case*, there was no testimony whatever that cataract on the claimant's eye was due to a chemical solution which came in contact with his eye during employment. The evidence was to the contrary.

In the *Hubbard Case*, we found that while the medical evidence was to the effect that the claimant died from an intracranial hemorrhage, there was no evidence upon which to base a conclusion that the hemorrhage resulted from an injury to claimant's knee received four months prior thereto.

The following facts, we think, sufficiently and abundantly support the claim of the appellant:

Charles L. Ellis, III, a young, healthy man with no previous history of injury or disease, except the arm infection and some pains in the knee following that infection, sustained an injury to his left knee from a falling rock on December 5, 1941, while engaged in the course of his employment by the Commonwealth of Virginia. The trouble in his knee resulting from the arm infection had cleared up or practically cleared up before December 5th, when he sustained the injury by the rock. It is agreed that there was no relationship between the arm infection and the development of the sarcoma.

There were no indicia of active sarcoma indicated during the period of the arm infection and before December 5th. Following the injury there was soreness about the knee, with a gradual increase in swelling and associated increase in pain, indicia of sarcoma, which progressed until the claimant en-

tered a hospital for an examination on December 26th. A critical examination disclosed cancer of his knee, and on December 31, 1941, the leg was amputated. The positive opinions of the two attending physicians attributed the sarcoma solely to the accident; while the opinion of the physician for the employer, based upon an incomplete acquaintance with all of the facts, merely held that, in accordance with the general view of the medical authorities he followed, it was either improbable or unlikely that the blow of the rock did cause the sarcoma or its development, although it was possible for trauma to cause sarcoma or to accelerate a pre-existing sarcoma.

The force and effect of the uncontradicted facts, and the opinions of the two competent attending physicians based thereon have not been overcome by the opinion of the non-attending physician, based upon probable or conjectural causes, and qualified with an admission of the lack of certain material information which was before the attending physicians. Facts prevail over possibilities or probabilities.

While the case might have been more fully developed on the question of an acceleration of a pre-existing sarcoma, the failure to do so probably is explained by the positive testimony of Doctors Reeves and Ralston that the accident was the sole cause of the disability. If, however, it be still contended that the sarcoma existed prior to the accident, it must have been latent and quiescent, so far as the record discloses. We are told that a trauma may cause a latent sarcoma to become active and accelerated, and, since here the recognized indicia of sarcoma became manifest immediately after the accident and progressively increased until the leg was amputated, if there was a latent sarcoma, it seems to us impossible to separate the injury from its aggravation, and aggravation is properly classed as a proximate cause of disability.

Upon the whole, we conclude that the Industrial Commission erred in refusing to allow the claimant compensation under the facts recited. For the reasons stated,

its order is reversed, and the cause is remanded with the direction that the claimant be awarded the full amount of compensation allowed by law.

*Reversed and remanded.*