COURT OF APPEALS OF VIRGINIA


Present:  Judges Bray, Frank and Humphreys
Argued at Chesapeake, Virginia


PRINCESS ANNE BUILDERS, INC. AND
 NATIONWIDE MUTUAL INSURANCE COMPANY
                                        OPINION BY
v.    Record No. 0872-01-1        JUDGE ROBERT J. HUMPHREYS
                                       NOVEMBER 6, 2001
JAMES V. FAUCETTE


          FROM THE VIRGINIA WORKERS' COMPENSATION COMMISSION

            Robyn L. Neal (Robey, Spence & Drash, on
            brief), for appellants.

            W. Mark Broadwell (Forbes & Broadwell, on
            brief), for appellee.


     Princess Anne Builders, Inc. ("PAB") and its insurer

Nationwide Mutual Insurance Company, appeal the commission's

award of benefits to James V. Faucette.  Appellants contend that

the commission erred in finding PAB was Faucette's statutory

employer, in finding that Faucette was disabled from May 23,

1995 through August 14, 1995, as well as April 5, 2000 and

continuing, and in finding appellants responsible for Faucette's

memory problems.

                        I.  Background

     It is well settled that "'[t]he Commission's findings of

fact are conclusive and binding on this court if supported by

credible evidence.'"  The Greif Companies v. Hensley, 22 Va.

App. 546, 552, 471 S.E.2d 803, 806 (1996) (citation omitted).

So viewed, the commission determined that PAB was a construction company that engaged routinely in the business of purchasing lots from a developer, doing site work, and constructing homes on these lots pursuant to a contract with a prospective buyer. In performance of one of these contracts, PAB subcontracted with Faucette's Tree Service to trim and remove tree limbs behind a home they were constructing. A provision in the particular real estate sales contract at issue specifically required PAB to trim the tree branches behind the newly constructed home.

Don Dickerson, a supervisor for PAB, requested that Faucette's Tree Service remove the tree limbs at the residence on May 22, 1995, before an inspection by the prospective owner that was scheduled for later that day. At that time, Faucette was employed by his brother who owned Faucette's Tree Service.[1] When they arrived at the site, Faucette's brother informed Dickerson that the branches were too high and that they would have to hire "tree climbers" to trim the limbs. Nevertheless, after some discussion with Dickerson, Faucette climbed a ladder to about 40 feet up one of the trees and began to cut the limbs. After cutting one limb, Faucette lost his balance and fell.

---

[1] The evidence demonstrated that prior to May 22, 1995, Faucette had been deemed "disabled" by the Social Security Administration due to his diabetes, liver problems and other related conditions. Faucette was receiving benefits for his disability at the time of the accident. Nonetheless, Faucette had been employed by his brother on a consistent basis prior to the date of the accident.

Faucette was transported immediately to a hospital where he was treated for a complex scalp laceration, an occipital fracture, a cervical spine fracture, cervical radiculopathy, and other traumas. The emergency technician noted that Faucette "did not remember all the events of the fall." While in the hospital, Faucette was placed in "cervical tong traction" with a "halo ring."

On May 30, 1995, Faucette's neurologist recommended that he undergo physical therapy due to his "mushy" triceps. On June 2, 1995 the neurologist noted Faucette's significant triceps and deltoid weakness. He also noted a concern about Faucette's concussion, stating that Faucette suffered from dizziness and had difficulty with concentration and memory. Faucette was ultimately discharged from the hospital on June 8, 1995.

Faucette saw Dr. Arthur Gillman on June 26, 1995. Dr. Gillman noted that Faucette was doing "quite well and ha[d] been ambulatory and engaging in some routine activities." However, Faucette underwent cervical fixation surgery on July 11, 1995.

On August 14, 1995, Dr. Gillman removed Faucette's traction halo device and fitted him with a cervical collar. Dr. Gillman stated:

-

Since discharge, Mr. Faucette has continued to [do] quite well. His incision is entirely healed and he notes no neck discomfort and, if anything, some improvement in the triceps weakness which was noted after the injury. He has continued to have some arm discomfort and dysesthesia but I feel this may be related to his history of diabetic neuropathic pain which was noted to be present premorbidly.

He advised "that [Faucette] continue with conservative activities at home and avoid driving or any heavy lifting or bending."

Faucette treated with Dr. Gillman again on March 18, 1996. Dr. Gillman noted at that time that Faucette appeared to have "done quite well over the past several months," with "marked improvement in the strength of his upper extremities and no parasthesia or other neurological symptoms." Dr. Gillman did not refer to any work restrictions, but advised Faucette to return for a follow-up examination in six months.

On May 21, 1996, Dr. James Phillips, an orthopedist, examined Faucette and diagnosed him with "C8 radiculopathy with chronic triceps weakness secondary to fracture sublaxation." Dr. Phillips referred Faucette to a neurosurgeon, Dr. James Allen, who examined Faucette on July 30, 1996. Dr. Allen diagnosed Faucette with dysfunction of the left shoulder joint.

On August 15, 1996, Dr. William Mullins, another orthopedist, examined Faucette and diagnosed him with a partial frozen shoulder. Faucette received physical therapy through

-

September 4, 1996.  A letter dated September 5, 1996 from the physical therapist to Dr. Mullins stated that Faucette had seen no increase in the strength of his left shoulder.  The therapist recommended continued physical therapy for the condition, but the records before the commission showed no evidence that Faucette continued treatment after that date.

Dr. Tamara Fox, Faucette's family physician, treated Faucette on several occasions for shoulder pain between 1996 and 1998.  On March 17, 1998, Dr. Fox diagnosed Faucette with cervical muscle strain but mentioned no work restrictions.  On April 29, 1998, Dr. Fox performed a complete physical exam and noted Faucette's neck appeared to be "normal."

Faucette was later examined by Dr. James Reid on April 5, 2000.  Dr. Reid diagnosed Faucette with memory loss, chronic pain syndrome, and C8 radiculopathy secondary to the 1995 accident.  He opined that Faucette was "permanently and totally disabled from gainful employment," due to the chronic pain syndrome and Faucette's inability to walk or change positions without aggravating the "chronic pain syndrome, the memory loss, and the severe de-conditioning and specifically triceps atrophy."  Dr. Reid confirmed that the 1995 accident caused Faucette's disability, notwithstanding his extensive medical history, reasoning that persons with "his diabetes and level of peripheral neuropathy who are without other injury or illness

-

are known to be able to function satisfactorily in the workplace."

Faucette sought an award of medical benefits and temporary total disability benefits from May 22, 1995 and continuing. Appellants defended the application arguing that Faucette was not an employee, that PAB was not Faucette's statutory employer, that Faucette's disability was not related to the accident, and that Faucette failed to make reasonable efforts to market his residual work capacity. Appellants also sought indemnity from Faucette's Tree Service in the event they were found responsible for Faucette's injuries and resulting disability.

During the hearing, Sidney Wood, PAB's president, characterized the company as a home construction business and averred that landscaping was not part of the company's general business. Wood testified that the company regularly employed subcontractors for plumbing, framing and electrical work, in addition to landscaping work.

Dickerson, the site supervisor, acknowledged that he had contracted with Faucette's Tree Service to trim the trees before the scheduled inspection for May 22, 1995, but denied that the actual tree Faucette fell from was one of the trees that he had asked the service to remove. In fact, Dickerson testified that he had directed Faucette not to work on the tree that he fell from.

-

The deputy commissioner denied Faucette's application finding that Faucette's Tree Service was not subject to the Act and that PAB was neither the employer nor statutory employer of Faucette. In so holding, the commissioner noted that Dickerson did not direct Faucette's work and that Faucette had failed to prove that landscaping or tree service was part of PAB's trade, business or occupation.

On review, the full commission reversed, holding that PAB was the statutory employer of Faucette at the time of the accident. Specifically, the commission agreed that the evidence did not establish that tree removal and landscaping were part of PAB's trade, business or occupation. However, they found that the main contract negotiated between PAB and the buyers of the property required PAB to trim the branches directly behind the house. Thus, pursuant to Code § 65.2-302(B), the commission held that PAB met the definition of Faucette's statutory employer as PAB was essentially a general contractor, obligated by a main contract to complete the entire project, and that the work out of which the accident arose was a subcontracted-fraction of that contract. The commission remanded the matter to the deputy commissioner to make findings regarding the extent of Faucette's disability, as well as his periods of disability and/or marketing efforts.

During the final hearing in the matter, Faucette submitted additional medical evidence concerning his injuries, and lay

-

testimony suggesting that his memory had deteriorated since the accident. The deputy commissioner found that Faucette had proved he was totally disabled from May 22, 1995 through August 14, 1995. However, noting that Dr. Gillman released Faucette to limited activity at that time, and discounting the opinion of Dr. Reid, the commissioner found no credible medical evidence suggesting that Faucette could not work from August 15, 1995 and continuing. The commissioner finally determined that, based on the medical evidence, appellants were not responsible for Faucette's liver or memory problems, but were responsible for his neck and shoulder injuries.

On review, the full commission affirmed the deputy commissioner's award with modifications. Specifically, the commission found that Dr. Reid's examination and opinion with regard to Faucette's work capacity were credible and persuasive, based upon the medical evidence. Accordingly, the commission awarded Faucette benefits from the period of May 22, 1995 through August 14, 1995, as well as from April 5, 2000 and continuing. The commission further found that appellants were responsible for Faucette's memory problems.

On appeal, appellants argue that the commission erred in finding that PAB was the statutory employer of Faucette, in finding that Faucette was entitled to benefits from May 22, 1995 through August 14, 1995, as well as April 5, 2000 and continuing, and in finding appellants responsible for Faucette's

-

memory problems.  Faucette asserts cross-error, contending that the commission erred in finding he was not entitled to benefits between August 14, 1995 and April 5, 2000.

## II.  Analysis

We first note that "[t]he issue whether a person is a statutory employee presents a mixed question of law and fact which must be resolved in light of the facts and circumstances of each case."  Cooke v. Skyline Swannanoa, 226 Va. 154, 156, 307 S.E.2d 246, 247 (1983).

Code § 65.2-302 provides the following in relevant part:

> A.  When any person (referred to in this section as "owner") undertakes to perform or execute any work which is a part of his trade, business or occupation and contracts with any other person (referred to in this section as "subcontractor") for the execution or performance by or under such subcontractor of the whole or any part of the work undertaken by such owner, the owner shall be liable to pay to any worker employed in the work any compensation under this title which he would have been liable to pay if the worker had been immediately employed by him.

> B.  When any person (referred to in this section as "contractor") contracts to perform or execute any work for another person which work or undertaking is not a part of the trade, business or occupation of such other person and contracts with any other person (referred to in this section as "subcontractor") for the execution or performance by or under the subcontractor of the whole or any part of the work undertaken by such contractor, then the contractor shall be liable to pay to any worker employed in the work any compensation under this title which he would have been liable

-

to pay if that worker had been immediately employed by him.

The Virginia Supreme Court has stated:

"[T]he test is not one of whether the subcontractor's activity is useful, necessary, or even absolutely indispensable to the statutory employer's business, since, after all, this could be said of practically any repair, construction or transportation service. The test (except in cases where the work is obviously a subcontracted fraction of a main contract) is whether this indispensable activity is, in that business, _normally_ carried on through employees rather than independent contractors."

Cinnamon v. International Business Machines Corp., 238 Va. 471, 475-76, 384 S.E.2d 618, 620 (1989) (quoting Shell Oil Co. v. Leftwich, 212 Va. 715, 722, 187 S.E.2d 162, 167 (1972)).

In Cinnamon, the Court further extended this holding, finding that the Shell Oil test

consists of two prongs. One, the so-called "normal-work test", relates to the determination of statutory-employer status as defined in Code [§ 65.2-302(A) and (C)]. As the language of [that section] makes clear, that prong relates to an owner who engages an independent contractor to perform certain work. If the work out of which the industrial accident arose is, in the language of Shell Oil, work "normally carried on through [the owner's] employees rather than independent contractors", it is, in the language of the statute, a "part of [the owner's] trade, business or occupation". In such case, the owner is the statutory employer of the injured worker, whether directly employed by the independent contractor or by a subcontractor.

The other prong, an exception to the first and sometimes labeled the

-

> "subcontracted-fraction test", relates to the determination of statutory-employer status as defined in [Code § 65.2-302(B) and (C)]. In the context of the construction business, it relates to a general contractor, the party obligated by the main contract with the owner to complete the whole project. If the work out of which the accident arose was, in the language of <u>Shell Oil</u>, "obviously a subcontracted fraction of [that] contract" and, in the language of the statute, "not a part of the trade, business or occupation of" the owner, the general contractor who engaged the subcontractor to perform that fraction is the statutory employer of the injured worker, whether directly employed by the primary subcontractor or by a secondary subcontractor.

<u>Id.</u> at 476, 384 S.E.2d at 620.

Here, in applying Code § 65.2-302(B), the commission found Faucette failed to prove that tree removal and landscaping were part of PAB's trade or business. However, because PAB subcontracted with Faucette's Tree Service in performance of a real estate sales contract contemplating the ultimate sale of the property to the buyers, the commission held PAB liable as Faucette's statutory employer.

We do not find error in the commission's resulting determination. Here, PAB, although the "owner" of the home and property, contracted with the buyer to complete construction of the home and development of the lot, and then to deliver the property to the buyer. In performance of that contract, PAB subcontracted a fraction of the required work - trimming the trees - to Faucette's Tree Service.

-

Under the clear language of Code § 65.2-302(B), in a situation where a general contractor contracts to execute work for "another person," which is not a part of that "other person['s]" trade, business or occupation, and then contracts with a subcontractor to perform the whole or any part of the work required under the contract, the contractor is liable as the statutory employer of the subcontractor's employees for purposes of the code section.

Thus, under these facts and circumstances, PAB was the statutory employer of Faucette. The tree removal was clearly a subcontracted-fraction of the main sales contract. Further, no evidence was presented to indicate that home construction and/or lot development was part of the trade, business or occupation of the "other person" here - the home buyer. Thus, PAB falls squarely within the definition of the statutory employer of Faucette, pursuant to Code § 65.2-302(B). Accordingly, we affirm the decision of the commission on this issue.

Finally, appellants ask us to address Faucette's eligibility for benefits and their liability for his memory problems, and Faucette seeks review regarding his eligibility for benefits between the periods of August 14, 1995 and April 5, 2000. As to each of these arguments we again state that "[w]e will not disturb the factual determination of causation if credible evidence supports the finding, even if the record contains evidence to the contrary. Additionally, '[q]uestions

-

raised by conflicting medical opinions will be decided by the commission.'" Food Distributors v. Estate of Ball, 24 Va. App. 692, 704, 485 S.E.2d 155, 161 (1997) (quoting Penley v. Island Creek Coal Co., 8 Va. App. 310, 318, 381 S.E.2d 231, 236 (1989)).

> "In determining whether credible evidence exists, the appellate court does not retry the facts, reweigh the preponderance of the evidence, or make its own determination of the credibility of the witnesses." Wagner Enterprises v. Brooks, 12 Va. App. 890, 894, 407 S.E.2d 32, 35 (1991). "Matters of weight and preponderance of the evidence, and the resolution of conflicting inferences fairly deducible from the evidence, are within the prerogative of the commission, and are conclusive and binding on the Court of Appeals." Kim v. Sportswear, 10 Va. App. 460, 465, 393 S.E.2d 418, 421 (1990) (citation omitted); see also Code § 65.2-706(A).

City of Richmond Fire Dep't v. Dean, 30 Va. App. 306, 311-12, 516 S.E.2d 709, 711-12 (1999).

We find the evidence here supports the commission's determination on these issues. The commission carefully considered the voluminous amount of medical evidence involved in these proceedings, including that of Faucette's prior medical history. In addition, although the commission was entitled to give lesser weight to Dr. Reid's opinion because he was not Faucette's treating physician, it was not obligated to do so. See Georgia-Pacific Corp. v. Robinson, 32 Va. App. 1, 5, 526 S.E.2d 267, 269 (2000) ("The probative weight to be accorded

-

[medical] evidence is for the Commission to decide; and if it is in conflict with other medical evidence, the Commission is free to adopt that view 'which is most consistent with reason and justice.'" (quoting C.D.S. Const. Services v. Petrock, 218 Va. 1064, 1070, 243 S.E.2d 236, 240 (1978))).

Thus, we affirm the decision of the commission.

Affirmed.

-