COURT OF APPEALS OF VIRGINIA

Present: Judges Frank, Kelsey and Senior Judge Coleman
Argued at Richmond, Virginia


TURF CARE, INC.

v.      Record No. 1810-07-2

MONROE HENSON, JR.,
  WINDSOR FARMS, INC.,
  CONTINENTAL INSURANCE COMPANY AND
  PAYROLL SERVICES OF VIRGINIA t/a
  SOURCE ONE GROUP, L.L.C.

                                                    OPINION BY
UNINSURED EMPLOYER'S FUND             JUDGE SAM W. COLEMAN III
                                                    MARCH 4, 2008

v.      Record No. 1827-07-2

MONROE HENSON, JR.,
  WINDSOR FARMS, INC.,
  CONTINENTAL INSURANCE COMPANY AND
  PAYROLL SERVICES OF VIRGINIA t/a
  SOURCE ONE GROUP, L.L.C.


            FROM THE VIRGINIA WORKERS' COMPENSATION COMMISSION

            Patricia C. Arrighi (PennStuart, on brief), for appellant Turf Care,
            Inc.

            Linda M. Gillen (Blair Law Offices, on brief), for appellant
            Uninsured Employer's Fund.

            Kevin M. McGowan (Marks & Harrison, on briefs), for appellee
            Monroe Henson, Jr.

            Anne C. Byrne (Warren H. Britt; Warren H. Britt, P.C., on briefs),
            for appellees Windsor Farms, Inc. and Continental Insurance
            Company.

            No brief or argument for appellee Payroll Services of Virginia t/a
            Source One Group, L.L.C.

Turf Care, Inc. ("Turf Care") and the Uninsured Employer's Fund ("the Fund") appeal a decision of the Workers' Compensation Commission awarding temporary total disability and medical benefits to Monroe Henson, Jr. (claimant). Turf Care and the Fund contend the commission erred in finding that (1) claimant sustained an injury by accident arising out of his employment on July 16, 2003; and (2) Windsor Farms, Inc. ("WF, Inc.") was not claimant's statutory employer. In addition, Turf Care contends the commission erred in finding it failed to comply with its obligation to provide workers' compensation insurance coverage pursuant to Code § 65.2-800. For the reasons that follow, we affirm in part, and reverse in part the commission's decision.

## I. Arising out of the Employment

The facts are undisputed. On July 16, 2003, Turf Care assigned claimant and Wilbert Johnson to clean leaves and debris from the gutters of homes in the Windsor Farms ("Windsor Farms") subdivision. While performing that task, claimant fell from a forty-foot extension ladder from the second story of a home. As a result, he sustained severe orthopedic and neurological injuries. His neurological injuries were so severe that he did not remember anything about the accident.

Johnson testified that as he and claimant cleaned gutters on July 16, 2003, claimant went up and down the ladder, while Johnson held the ladder and assisted in moving it from place to place. Claimant carried a five-gallon bucket up the ladder, reached to the right and left to remove leaves and debris from the gutters, leaning from one side of the ladder to the other, placed the leaves and debris in the bucket, and then carried the bucket back down the ladder and dumped it into a trash can. Johnson stated that each time claimant came down the ladder, they "just slide the ladder over" about two to three feet. Because the ladder was an extension ladder, only one end of it had contact with the ground and the other end leaned on the roof. When asked

how claimant got injured, Johnson testified as follows: "All I know is he went up the ladder, tied the bucket up there and then he started cleaning leaves, talking to the man in the window [in another house to the right], then he stopped talking and after that, he fell." Johnson was "looking up and the next thing" he knew claimant fell. Johnson said claimant "reached to the right to put some leaves in the bucket and then after that he fell." Johnson asserted that claimant fell to his left, while Johnson was standing facing the house. The bucket did not fall. It was still on the roof at the top of the ladder, right in the very middle of the ladder. At the time of claimant's fall, he and Johnson had been working for about one-half hour and had gone from the left side of the house almost to the end of the right side of the house.

Michael Carter, claimant's supervisor, testified that when he arrived at the accident scene, claimant was on the ground and the ladder was "still in the position that it was in when [claimant] fell."

Based upon this testimony, the commission found that "the facts in this case justify inferring that the claimant was in a dangerous position, doing work that caused him to be more likely to fall, and lost his balance and fell." We agree.

Whether an employee's work-related injury arises out of his employment "involves a mixed question of law and fact, which we review *de novo* on appeal." Blaustein v. Mitre Corp., 36 Va. App. 344, 348, 550 S.E.2d 336, 338 (2001). "'Decisions of the commission as to questions of fact, if supported by credible evidence, are conclusive and binding on this Court.'" Basement Waterproofing v. Beland, 43 Va. App. 352, 358, 597 S.E.2d 286, 289 (2004) (quoting WLR Foods v. Cardosa, 26 Va. App. 220, 230, 494 S.E.2d 147, 152 (1997)). The commission is authorized to draw reasonable inferences from the evidence, Beland, 43 Va. App. at 359, 597 S.E.2d at 289, and on appeal, we will not disturb reasonable inferences drawn by the commission from the facts proven by the evidence presented. Id. at 360-61, 597 S.E.2d at 290; K & G

Abatement Co. v. Keil, 38 Va. App. 744, 758-60, 568 S.E.2d 416, 423-24 (2002) (commission's finding of compensable injury affirmed where evidence supported inference that employee fell from rooftop worksite). Furthermore, "'[t]he commission, like any other fact finder, may consider both direct and circumstantial evidence in its disposition of a claim. Thus, the commission may properly consider all factual evidence, from whatever source, in its decision whether or not a condition of the workplace caused the injury.'" Beland, 43 Va. App. at 358, 597 S.E.2d at 289 (quoting VFP, Inc. v. Shepherd, 39 Va. App. 289, 293, 572 S.E.2d 510, 512 (2003)).

> "[The Workers' Compensation Act] has always required the claimant to carry the burden of proving, by a preponderance of the evidence, . . . an 'injury by accident' . . . arising out of and . . . in the course of, the employment." "[Claimant's] evidence [must] demonstrate to the rational mind that [claimant's injury] is fairly . . . traced to [his or] her employment as the proximate cause. That may be accomplished by circumstantial evidence . . . ." "Circumstantial evidence is as competent and is entitled to as much weight as direct evidence, provided it is sufficiently convincing." "Any fact which may be proved with direct evidence also may be established with circumstantial evidence."

Id. at 357, 597 S.E.2d at 288 (citations omitted).

> "When there is apparent to the rational mind upon consideration of all the circumstances, a causal connection between the conditions under which the work is required to be performed and the resulting injury can be seen to have followed as a natural incident of the work and to have been contemplated by a reasonable person familiar with the whole situation, as a result of the exposure occasioned by the nature of the employment, then it arises out of employment. The causative danger must be peculiar to the work and not common to the neighborhood. It must be incidental to the character of the business and not independent of the relation of master and servant."
>
> "[The causative danger] need not have been foreseen or expected, but after the event it must appear to have had its origin in a risk connected with the employment, and to have flowed from that source as a rational consequence."

Id. at 356-57, 597 S.E.2d at 288 (citations omitted).

Based upon Johnson's testimony, the commission, as fact finder, could reasonably infer that claimant was in a dangerous position on a forty-foot extension ladder as it leaned against a two-story house, when he reached to the right to remove leaves and debris from the gutters, which would have prevented him from holding onto the ladder with both hands, and that he lost his balance and fell to the left. Thus, the causative danger was peculiar to claimant's work and connected to the conditions under which the work was required to be performed.

Contrary to the arguments of Turf Care and the Fund, we find this case more analogous to Beland than PYA/Monarch v. Harris, 22 Va. App. 215, 468 S.E.2d 688 (1996). In Beland, the claimant was working in a four-foot wide by ten to fifteen-foot long concrete stoop, with an eight-foot subwall. 43 Va. App. at 354, 597 S.E.2d at 287. His job involved applying tar and sealant to holes while standing on a portion of a ladder that had been dropped into a hole under the stoop. Id. at 354-55, 597 S.E.2d at 287. As he performed his job, he carried a twenty to thirty-pound bucket in one hand and a glove he used to smear the tar in his other hand, which prevented him from holding onto the ladder. Id. at 355, 597 S.E.2d at 287. He described climbing almost to the top of the ladder and balancing against the ladder, and then, the next thing he knew he woke up in the ambulance on the way to the hospital, having apparently fallen while on the ladder. Id. "When counsel asked claimant about the mechanics of reaching a hole to apply the tar prior to his fall, claimant responded, '[I]t was to one side stretching out. . . . About half my body [sic].'" Id. In affirming the commission's award in Beland, we concluded that "[w]hile claimant did not recall the specific moment of falling, he described his actions and locations immediately before the fall in detail. That evidence, combined with the other circumstances, created the "critical link" between claimant's employment, his fall and resulting injury." Id. at 360, 597 S.E.2d at 290.

Here, prior to claimant's fall, he was on a forty-foot extension ladder, as it leaned against a two-story house. He reached to the right to remove leaves and debris from the gutters, which would have prevented him from holding onto the ladder with both hands, and then he fell to the left. "Ladders, in and of themselves, are dangerous, and accidents involving ladders cannot be properly evaluated without taking into consideration the increased risk." Id. In this case, similar to Beland, testimony described claimant's "actions and locations immediately before the fall in detail. That evidence, combined with the other circumstances, created the 'critical link' between claimant's employment, his fall and resulting injury." Id.; see also City of Waynesboro v. Griffin, ___ Va. App. ___, ___ S.E.2d ___ (March 4, 2008). Thus, while claimant did not recall the accident, it was not unexplained. Rather, Johnson's eyewitness testimony describing in detail the circumstances leading up to and at the time of claimant's fall allowed the commission, as fact finder, to draw reasonable inferences as to how the accident occurred and to find claimant established the critical link between the conditions under which his work was required to be performed and his injury.

"'This case is distinguishable from Harris because this situation was "uniquely dangerous" and not something that would "routinely be encountered" by anyone.'" Beland, 43 Va. App. at 361, 597 S.E.2d at 290. In Harris, immediately before his fall, the claimant, was

> seated in the cab of his truck reaching for the grab bar, [which] did not present a uniquely dangerous situation not routinely encountered by any truck drivers. He could not state that the icy weather conditions caused him to slip or whether he had even stepped from the cab of the truck prior to his fall. He could not describe in any greater detail his activities prior to his fall. Thus, he failed to establish a "critical link" between his employment and the fall.

Beland, 43 Va. App. at 360-61, 597 S.E.2d at 290. Thus, in Harris, unlike Beland and this case, the claimant was not in a uniquely dangerous position at the time of his injury, and no testimony

- 6 -

described in detail his activities immediately before his fall. 22 Va. App. at 219, 224-25, 468 S.E.2d at 690, 692.

Accordingly, for the foregoing reasons, we conclude the commission did not err in finding that claimant proved he sustained an injury by accident arising out of his employment.

## II. Statutory Employer

"We first note that '[t]he issue whether a person is a statutory employee presents a mixed question of law and fact which must be resolved in light of the facts and circumstances of each case.'" Princess Anne Builders, Inc. v. Faucette, 37 Va. App. 102, 109, 554 S.E.2d 113, 117 (2001) (quoting Cooke v. Skyline Swannanoa, 226 Va. 154, 156, 307 S.E.2d 246, 247 (1983)). However, "[w]here, as here, the [relevant] facts . . . are not in dispute, 'we must determine whether the [commission] correctly applied the law to those facts.'" Fowler v. Int'l Cleaning Serv., Inc., 260 Va. 421, 425, 537 S.E.2d 312, 314 (2000) (quoting Cinnamon v. Int'l Bus. Mach. Corp., 238 Va. 471, 474, 384 S.E.2d 618, 619 (1989)).

On July 16, 2003, at the time of his accident, claimant was an employee of Turf Care. Carter, a Turf Care employee, assigned claimant to clean gutters of houses in Windsor Farms.

At the time of claimant's accident, WF, Inc. and Turf Care operated under a contractual agreement which pertained to maintenance and lawn care of common areas and residential properties in Windsor Farms. The agreement provided that WF, Inc., pursuant to an existing contractual agreement with the City of Richmond, was responsible for the maintenance and care of certain city-owned street medians, triangles, and cul-de-sacs within Windsor Farms. The agreement recited that WF, Inc. had for years provided grounds and lawn maintenance services for the Windsor Farms-owned and city-owned common areas within Windsor Farms and for residents of Windsor Farms desiring such service for their own yards and grounds. The agreement provided that by "Agreement dated April 1, 1996, [WF, Inc.] contracted with Turf

- 7 -

Care, a vendor of grounds maintenance and lawn care services, to take over such services from [WF, Inc.]. The parties have since operated in accordance with the Agreement of April 1, 1996 as amended and renewed on April 1, 2002."

In the agreement, Turf Care agreed to provide full maintenance and care for the common areas in Windsor Farms, with its charges to be paid by WF, Inc., "less 12% of resident services revenue." With respect to services for residents, Turf Care agreed to provide, "in the name of [WF, Inc.], a full range of lawn care services to those Windsor Farms residents desiring such services." The agreement provided that "orders from residents and billings for such services will be coordinated through the [WF, Inc.] office, but the obligation for payment to Turf Care for such services shall be that of each resident ordering the service, not [WF, Inc.]." The agreement also stated that "in addition to the payments made to Turf Care for services rendered to [WF, Inc.], [WF, Inc.] will remit to Turf Care on the 15th and last day of each month an amount equal to the collected receipts from services Turf Care rendered to residents of Windsor Farms less 12%." Thus, the agreement provided that Turf Care receive full reimbursement for charges to residents for materials and equipment and 88% of its charges for services rendered.

In connection with the original agreement, WF, Inc. sold to Turf Care all of its lawn care and grounds maintenance equipment. While Turf Care was to be responsible for maintaining that equipment and providing fuel, WF, Inc. agreed to pay directly or reimburse Turf Care for the cost of operating the trash truck when used for annual leaf pickup. Turf Care agreed that the services provided under the agreement would be under the direction of Jo Ann Smiley, the WF, Inc. office manager, with all other personnel involved in rendering services under the agreement to be employed by Turf Care. WF, Inc. agreed to pay the cost of office supplies, a local phone line, and other expenses related to billing, collection, and other business activity associated with the Windsor Farms accounts. Pursuant to the agreement, Turf Care assigned Carter as the daily,

on-site supervisor of the operations contemplated by the agreement. The agreement required that all personnel providing grounds maintenance and lawn care services wear a uniform identifying them as assigned to Windsor Farms. The uniform was not to identify the personnel solely as employees of Turf Care, but was to also reflect that their services were being provided on behalf of Windsor Farms.

Carter testified that that he manages the Windsor Farms operation for Turf Care, which involves maintaining the common grounds within the neighborhood and approximately fifty percent of the residential properties. Carter works out of the on-site Windsor Farms office, along with Smiley, who works from 8:30 a.m. to 12:30 p.m., Monday through Friday. Smiley takes most of the calls from homeowners requesting services during her work hours and relays that information to Carter. At other times, Carter takes the homeowners' calls or they leave messages.

Thomas Herrington, Turf Care's president, testified that before Turf Care entered into the agreement with WF, Inc. in 1996, WF, Inc. performed some of the common grounds maintenance along with the City of Richmond, and WF, Inc. performed work for individual Windsor Farms' homeowners. At that time, WF, Inc. had nine to twelve employees. Herrington indicated that the WF, Inc. board is involved in setting the price Turf Care charges to homeowners. The homeowners were billed on Windsor Farms stationery and paid the fees to Windsor Farms, who then paid Turf Care, less twelve percent. Herrington acknowledged that Turf Care has operations other than Windsor Farms and that he works out of an office not located in Windsor Farms.

Smiley testified that currently she is the only employee of WF, Inc. She stated that on the date of claimant's accident, WF, Inc. did not perform any maintenance on homeowners' properties in the subdivision, and had not done so since April 1, 1996, when it entered into the

agreement with Turf Care. Smiley contended that WF, Inc. does not instruct Turf Care how to perform its work, but does ask for "good quality." Smiley agreed that Turf Care, pursuant to the agreement, is required to perform their duties, with respect to the common areas, as prescribed in the "Windsor Farms Landscape Maintenance Manual," which was created by a landscape architect for WF, Inc. and then given to Turf Care. Smiley stated that Windsor Farms' residents are not required to use Turf Care for home maintenance. She stated that if a resident makes a complaint, she writes it up and gives it to Carter. Smiley acknowledged that WF, Inc. does not have a contract with any other company to provide lawn service and maintenance in Windsor Farms. Smiley, who has been employed by WF, Inc. for twenty-two years, agreed that WF, Inc. is a corporation formed to enforce the covenants of Windsor Farms and to assure that its common areas are properly maintained. Smiley agreed that from 1982 through April 1, 1996, WF, Inc. employees performed grounds maintenance and lawn care for Windsor Farms. She stated that in 1996, WF, Inc. decided to replace its employees with another company to perform the same work.

While the commission analyzed this issue under subsection B of Code § 65.2-302, we find the facts of this case fall under subsection A of that Code section, which provides as follows:

> When any person (referred to in this section as "owner") undertakes to perform or execute any work which is a part of his trade, business or occupation and contracts with any other person (referred to in this section as "subcontractor") for the execution or performance by or under such subcontractor of the whole or any part of the work undertaken by such owner, the owner shall be liable to pay to any worker employed in the work any compensation under this title which he would have been liable to pay if the worker had been immediately employed by him.

- 10 -

In <u>Henderson v. Central Telephone Co. of Va.</u>, 233 Va. 377, 355 S.E.2d 596 (1987), in construing former Code § 65.1-29, now Code § 65.2-302(A), the Supreme Court stated as follows:

> Code § 65.1-29 contemplates that an owner . . . can subcontract all its work yet remain liable under the Act. This provision is meant to prevent an owner from escaping liability under the Act by the simple expedient of subcontracting away work, which is part of its trade, business, or occupation. Such an owner will remain liable under the Act to the extent the work subcontracted is part of that owner's trade, business or occupation.

<u>Id.</u> at 381, 355 S.E.2d at 598-99 (citation omitted).

> "[T]he test is not one of whether the subcontractor's activity is useful, necessary, or even absolutely indispensable to the statutory employer's business, since, after all, this could be said of practically any repair, construction or transportation service. The test (except in cases where the work is obviously a subcontracted fraction of a main contract) is whether this indispensable activity is, in that business, *normally* carried on through employees rather than independent contractors."

<u>Faucette</u>, 37 Va. App. at 110, 554 S.E.2d at 117 (emphasis added) (quoting <u>Cinnamon</u>, 238 Va. at 475-76, 384 S.E.2d at 620). The Supreme Court held in <u>Cinnamon</u> that

> [t]he <u>Shell Oil [Co. v. Leftwich</u>, 212 Va. 715, 187 S.E.2d 162 (1972),] test consists of two prongs. One, the so-called "normal-work test", relates to the determination of statutory-employer status as defined in Code [§ 65.2-302(A) and (C)]. As the language of [that section] makes clear, that prong relates to an owner who engages an independent contractor to perform certain work. If the work out of which the industrial accident arose is, in the language of <u>Shell Oil</u>, work "normally carried on through [the owner's] employees rather than independent contractors", it is, in the language of the statute, a "part of [the owner's] trade, business or occupation". In such case, the owner is the statutory employer of the injured worker, whether directly employed by the independent contractor or by a subcontractor.

<u>Cinnamon</u>, 238 Va. at 476, 384 S.E.2d at 620.

From at least 1982 through 1996, WF, Inc. was in the trade, business, and occupation of providing maintenance and lawn services to homeowners in Windsor Farms. After April 1, 1996, when WF, Inc. entered into the contract with Turf Care, WF, Inc.'s employee, Smiley, continued to take orders for work at homeowners' residences, conduct billing, and collect fees, which WF, Inc. then paid to Turf Care. WF, Inc. set the prices Turf Care could charge to homeowners and dictated that Turf Care maintain a certain quality of work. In addition, WF, Inc. required Turf Care employees to wear uniforms with both the Windsor Farms and Turf Care logos and retained twelve percent of the fees received from work performed by Turf Care on private residences. Thus, while it contracted away its grounds maintenance and lawn care business in 1996 to Turf Care, WF, Inc. never really got out of that trade, business, or occupation by continuing to retain control over it and being involved in its day-to-day operation.

The purpose of Code § 65.2-302 is to afford protection to "'the employees of [independent contractors] who [may] not [be] financially responsible and to prevent employers from relieving themselves of liability [for compensation] by doing through independent contractors what they otherwise would do through direct employees.'" Bassett Furniture Industries, Inc. v. McReynolds, 216 Va. 897, 902, 224 S.E.2d 323, 326 (1976) (quoting Sears, Roebuck & Co. v. Wallace, 172 F.2d 802, 810 (4th Cir. 1949)). WF, Inc. cannot subcontract all of its trade, business and occupation and escape liability of the Act.

WF, Inc. argues that because its only employee, Smiley, did not provide maintenance and lawn services to individual homeowners, it is exempt from liability. However, this record shows that maintenance and lawn services for Windsor Farms' homeowners is a regular business practice of WF, Inc., which it converted from being done by its own employees in the past to being done through a contractor, Turf Care, yet it still retained oversight of the quality of Turf

- 12 -

Care's work and maintained involvement in the day-to-day operations of Turf Care on WF, Inc. property.[1]

> The Shell Oil test is merely an approach that is useful in determining an entity's trade, business or occupation. It is not designed for every situation. It works best in cases involving private businesses because those entities often define their trade, business or occupation by their conduct. With regard to such entities, what they do on a day-to-day basis provides a reasonably reliable indicator of their trade, business, or occupation.

Henderson, 233 Va. at 383, 355 S.E.2d at 599.

The conduct of WF, Inc. as described by Herrington, Carter, and Smiley clearly demonstrates its control over Turf Care. We find that Turf Care and its employees were engaged in a service of WF, Inc. at the time of claimant's accident. Thus, we reverse the commission's findings of fact and conclusions of law on this issue, and conclude that claimant was, at the time of his accident, a statutory employee of WF, Inc.

III. Obligation to Provide Workers' Compensation Insurance under Code § 65.2-800

We are bound by the commission's findings of fact if those findings are supported by credible evidence. Lynch v. Lee, 19 Va. App. 230, 234, 450 S.E.2d 391, 393 (1994). On appeal, we view the evidence in the light most favorable to the prevailing party below. R.G. Moore Bldg. Corp. v. Mullins, 10 Va. App. 211, 212, 390 S.E.2d 788, 788 (1990). However, because statutory interpretation presents a pure question of law, it is subject to *de novo* review by this Court. Ainslie v. Inman, 265 Va. 347, 352, 577 S.E.2d 246, 248 (2003).

It was undisputed that Turf Care had no workers' compensation insurance coverage on the date of claimant's accident. However, Turf Care had contracted with Payroll Services of

---

[1] WF, Inc. understandably makes no alternative claim that, even if held to be a statutory employer, it would be exempt from liability under Code § 65.2-302(D). In this case, subsection (D)(1)(c) of Code § 65.2-302 disqualifies WF, Inc. from such an exemption because WF, Inc. received profit in the form of 12% of the fees charged by Turf Care for their services.

- 13 -

Virginia, t/a Source One Group, L.L.C. (Source One), a professional employer organization (PEO), for it to provide Turf Care's workers' compensation coverage. Without Turf Care's knowledge, Source One improperly lapsed the coverage, despite continuing to collect premiums. The commission found that Turf Care failed to insure its liability, holding that:

> Virginia Code § 65.2-800 mandates that every employer "shall" secure workers' compensation insurance. Code § 65.2-801 lists acceptable methods through which the employer may procure the insurance. In the present case, Turf Care failed to obtain workers' compensation insurance as dictated by § 65.2-800.

While the commission found Turf Care violated Code § 65.2-800, it did not impose a civil penalty pursuant to Code § 65.2-805 because it found that Turf Care "reasonably relied on [Source One's] contractual obligations and sought to obtain a valid policy, once discovering it was uninsured."

On appeal, Turf Care argues that the commission erred in finding it violated Code § 65.2-800 because its failure to comply with that code section was not due to its own neglect, malfeasance, mistake, action or failure to act, rather, it was due to Source One's fraudulent and criminal actions. Turf Care argues that the effect of the commission's finding allows the Fund to attach Turf Care's assets and put it out of business. Essentially, Turf Care maintains that it "should not be punished for the failure of Source One to comply with its contractual and statutory obligations."

The provisions of the Workers' Compensation Act (the Act) apply to "[e]very employer and employee," who are "conclusively presumed to have accepted the provisions of [the Act] . . . ." Code § 65.2-300(A). Code § 65.2-800(A) requires that "[e]very employer subject to the compensation provisions of this title *shall* insure the payment of compensation to his employees *in the manner hereinafter provided*." (Emphasis added.) The methods thereafter provided for an

- 14 -

employer to secure its liability for workers' compensation are set forth in Code § 65.2-801 as

follows:

> 1.  Insuring and keeping insured his liability in an insurer authorized to transact the business of workers' compensation insurance in this Commonwealth;
>
> 2.  Receiving a certificate pursuant to § 65.2-808 from the Workers' Compensation Commission authorizing such employer to be an individual self-insurer;
>
> 3.  Being a member in good standing of a group self-insurance association licensed by the State Corporation Commission; or
>
> 4.  Entering into an agreement with a professional employer organization for professional employer services which includes voluntary market workers' compensation insurance for coemployees of the professional employer organization and the client company procured from an insurer authorized to transact the business of workers' compensation insurance in this Commonwealth. A professional employer organization may obtain voluntary market workers' compensation insurance in its own name for all coemployees which it shares or which are assigned or allocated to it pursuant to the agreement between the professional employer organization and the client company. The client company shall maintain separate voluntary market workers' compensation insurance insuring any and all employees of the client company not insured through the policy obtained by the professional employer organization.

Code § 65.2-805 states that employers who fail to comply with Code §§ 65.2-800 or 65.2-804

"*shall* be assessed" a civil penalty of not less than $500 nor more than $5,000. (Emphasis

added.)

The purpose of the Act is to protect employees. Ellis v. Commonwealth Dep't of

Highways, 182 Va. 293, 303, 28 S.E.2d 730, 734 (1944). Thus, it is to be "construed liberally

and favorably as to" employees. Id. Moreover, in construing the Act we must "'ascertain and

give effect to the intention of the legislature'" which is "usually self-evident from the words used

in the statute. Consequently, courts apply the plain language of a statute unless the terms are

- 15 -

ambiguous, or applying the plain language would lead to an absurd result." Boynton v. Kilgore, 271 Va. 220, 227, 623 S.E.2d 922, 925-26 (2006) (quoting Chase v. Daimler Chrysler Corp., 266 Va. 544, 547, 587 S.E.2d 521, 522 (2003)) (citations omitted).

Here, the plain language of the statutes is not ambiguous, and their application will not lead to an absurd result. The General Assembly has provided that every employer subject to the Act *shall* maintain workers' compensation insurance coverage; a requirement that protects employees by enabling them to collect any workers' compensation claims due them by their employers. Turf Care is an employer subject to the Act. It is, therefore, required by law to maintain workers' compensation insurance coverage under one of the methods set forth in Code § 65.2-801. Turf Care complied with that obligation by entering into an agreement with Source One, a PEO, for such coverage. Turf Care paid premiums to Source One, and no evidence showed Turf Care had knowledge or reason to believe it was not insured at the time of claimant's accident. Accordingly, we reverse the commission's finding that Turf Care failed to comply with its statutory obligation under Code 65.2-800.

For these reasons, we affirm in part and reverse in part.

Affirmed in part,
and reversed in part.

- 16 -