### Alexandria

CREATIVE DIMENSIONS GROUP, INC.

and

NATIONWIDE MUTUAL INSURANCE COMPANY

v.

TERRANCE R. HILL

No. 1599-92-4

Decided June 8, 1993

COUNSEL

Matthew W. Broughton (Melissa Warner Scoggins; Gentry, Locke, Rakes & Moore, on brief), for appellants.

Jack T. Burgess (Burgess & Trapeni, on brief), for appellee.

OPINION

**FITZPATRICK, J.**—Creative Dimensions Group, Inc. and Nationwide Mutual Insurance Company (collectively referred to as employer) appeal the decision of the commission awarding permanent disability benefits to Terrance R. Hill (claimant) for the permanent, total (100%) loss of use of his right eye. *See* Code § 65.2-503(B)(14). Employer argues that an intraocular lens implant has permanently improved claimant's visual acuity in his right eye to 20/40+1 and, therefore, the commission erred in awarding claimant disability benefits for a permanent, total (100%) visual acuity loss. We disagree with employer and affirm the commission's award.

## BACKGROUND

On November 21, 1988, claimant suffered a compensable injury to his right eye and cheek. The parties agree that claimant had perfect vision before this industrial accident. Employer paid temporary, total disability benefits for the injury pursuant to a Memorandum of Agreement signed March 14, 1989. As a direct result of the original eye injury, claimant later developed a traumatic cataract and his vision deteriorated from 20/20 to 20/60–2.

On November 29, 1990, claimant underwent surgery to remove the cataract from his eye and to replace his natural lens with an intraocular lens implant.[1] Claimant's vision was 20/60–2 prior to the implant surgery and 20/40+1 after the implant surgery (without glasses).[2] After the natural lens was extracted, and without the aid or benefit from the intraocular lens implant, claimant's vision was diagnosed as less than 20/200. Claimant bases his application for permanent, total (100%) loss of vision on his visual acuity of 20/200, that is, his visual acuity unaided by the artificial lens implant. As a result of claimant's post-implantation visual acuity of 20/40+1, employer argues that claimant is not entitled to disability benefits for permanent, total (100%) loss of the right eye. Employer acknowledges that claimant is entitled to benefits for some loss of vision, but contends that he should only receive permanent partial benefits based on either his post-surgery visual acuity of 20/40+1 or on his pre-surgery vision of 20/60–2.

The commission found that the removal of the cataract and the subsequent intraocular lens implant was reasonable and necessary medical treatment resulting from the November 21, 1988 industrial accident. The evidence proved that this procedure is the presently accepted method of treatment in the medical community for a traumatic cataract. Indeed, employer pre-approved this procedure and, on brief to this Court, acknowledges that "[i]ntraocular lens implants are used in 98% of all cataract cases."

## DETERMINATION OF THE EXTENT OF LOSS OF VISION

The disposition of this case turns upon the proper method of determining the "[p]ermanent total loss of the vision of an eye" pursuant to Code § 65.2-503(B)(14). At issue is whether the permanency rating for vision loss should be based on a claimant's visual acuity without regard to the correction provided by an intraocular lens implant. This is a case of first impression in Virginia.

The commission, relying on *Owen v. Chesapeake Corp.*, 198 Va. 440, 94 S.E.2d 462 (1956), awarded claimant benefits for permanent, total (100%) loss of vision to his right eye on the basis that the degree of vision loss should be determined without regard to any artificial aid or corrective device. *See id.* at 442, 94 S.E.2d at 463. The commission

---

[1] The surgical procedure is known as an extracapsular cataract extraction with anterior vitrectomy and implantation of a posterior chamber intraocular lens.

[2] Claimant's visual acuity after the implant and with glasses is presently 20/25+1.

also found that claimant's implant did not necessarily provide a permanent restoration of his vision. We agree.

■ Our decision is governed by the following well-established legal principles. "[T]he Workers' Compensation [Act] should be construed liberally in favor of the worker, . . . [and the] Commission's findings of fact are binding on appeal where supported by credible evidence." *Board of Supervisors v. Martin*, 3 Va. App. 139, 146, 348 S.E.2d 540, 543 (1986), *appeal dismissed*, 363 S.E.2d 703 (Va. 1987) (citation omitted); Code § 65.2-706(A). "The fact that there is contrary evidence in the record is of no consequence if there is credible evidence to support the commission's finding." *Wagner Enters., Inc. v. Brooks*, 12 Va. App. 890, 894, 407 S.E.2d 32, 35 (1991). Furthermore, on appellate review, "[w]e are . . . required to construe the evidence in the light most favorable to the prevailing party [below]," the claimant. *Crisp v. Brown's Tysons Corner Dodge, Inc.*, 1 Va. App. 503, 504, 339 S.E.2d 916, 916 (1986).

The commission noted that the intraocular lens implant was not truly "permanent." Dr. Hensle, the claimant's treating ophthalmologist, testified by deposition that several possible circumstances might necessitate removal of the implanted lens.[3] Even with the lens implant, Dr. Hensle confirmed that the claimant still lacked the ability to focus normally and that "it's not unusual to see problems with some glare because the implant itself is not the same shape or consistency. Though it's a highly regulated and high-quality piece of merchandise, it's still not the same as the natural lens in the eye." In addition, the evidence established that claimant had suffered a post-surgical inflammation that required periodic instillation of drops into his eye. This medical testimony provides the credible evidence necessary to support the commission's finding that, under the facts of this case, claimant's intraocular lens implant was not a "permanent" restoration of his vision.

Notwithstanding the commission's conclusion that claimant's implant does not permanently restore his vision, the question remains whether the disability rating of a "total loss of vision" is determined

---

[3] Dr. Hensle noted that the major problems associated with this procedure, meaning both the cataract surgery and the implantation of the intraocular lens, include: (1) retinal detachment; (2) cystoid macular edema; (3) secondary cataract or membranous cataract (a clouding of the membrane used to hold back the vitreous gel); (4) implant dislocation; (5) infection, either acute or slow endophthalmitis (which might necessitate removal); (6) glare or inflammation caused by the implant itself; and (7) damage to the cornea or angle of the eye bringing out glaucoma.

with or without regard to the benefit obtained by the implant. The Workers' Compensation Act is silent on this issue. In *Owen*, the Supreme Court of Virginia was presented with a similar question in the context of a claimant's vision corrected with the aid of eyeglasses. 198 Va. at 442, 94 S.E.2d at 463. In that case, the Court approved the commission's determination of "claimant's degree of loss without recourse to the artificial aid which proper glasses would render." *Id.*

■ Employer argues that the rule set forth in *Owen*, a decision rendered in 1956, is inapplicable to this case because medical advancements, specifically the intraocular lens implant, has corrected claimant's sight to 20/40+1; thus, he cannot be considered as having suffered a "total loss of vision." We acknowledge that a split of authority exists in the judicial decisions of other states.[4] The majority of recently reported cases addressing this question reject employer's argument. The general rule has been stated as follows:

> [L]oss of use should be judged on the basis of uncorrected vision . . . and that therefore loss of use will not be ruled out because some correction is achieved. Indeed, an award for total blindness in one eye has been upheld although use of an optical lens had restored a "substantial function of the eye."

2 Arthur Larson, *The Law of Workmen's Compensation* § 58.13(f), at 10-492.140 to .147 (1992) (footnotes omitted). The two most commonly cited reasons for this rule are set forth below.

■ First, "we see nothing in the [Workers' Compensation Act] indicating an intention on the part of the legislature that disability after correction should be the basis for awarding compensation, where there has been an eye injury. If such had been the legislative intent, the act would no doubt have been drafted to so provide." *Kalhorn v. City of Bellevue*, 227 Neb. 880, 884, 420 N.W.2d 713, 716 (1988). We accept this reasoning as applicable to Code § 65.2-503(B)(14) because of the construction it has been given by the Supreme Court of Virginia in *Owen, see* 198 Va. at 442, 94 S.E.2d at 463, and by the commission, *see Pearson v. Virtexco Corp.*, 67 O.I.C. 146 (1988); *Morris v.*

---

[4] For decisions representing the minority view, see, for example: *Hakala v. Burroughs Corp.*, 417 Mich. 359, 338 N.W.2d 165 (1983) (applying a "corrected" vision standard for total and permanent disability); *Wasson v. Northeast Motor Co.*, 253 A.2d 349 (Me. 1969) (award for loss of vision improper where claimant's vision was correctable to 20/20); *Lee Connell Constr. Co. v. Swann*, 254 Ga. 121, 327 S.E.2d 222 (1985) (in a split decision based upon unreported "facts of the case," the Court held that an award for loss of vision should be based upon corrected vision after a lens implant).

*Charlottesville Constr. Co.*, 47 O.I.C. 246 (1965). "The construction afforded a statute by the public officials charged with its administration and enforcement is entitled to be given great weight by a court. The legislature is presumed to be cognizant of such construction. When it has long continued without change, the legislature is presumed to have acquiesced therein." *Watford v. Colonial Williamsburg Found.*, 13 Va. App. 501, 505, 413 S.E.2d 69, 71-72 (1992). This Court has recently held, within the context of the Virginia Workers' Compensation Act, that:

> We presume that the legislature is cognizant of the interpretation the statute has been given by . . . the Supreme Court of Virginia, and of the commission's application of Virginia precedent. Accordingly, we conclude that such construction is consistent with the legislative intent, particularly in the absence of any changes . . . in the recent amendments and recodification of Title 65.1.

*City of Norfolk v. Lillard*, 15 Va. App. 424, 430-31, 424 S.E.2d 243, 247 (1992) (footnote omitted).

The second reason cited in the opinions following the majority view focuses on the *actual effect* of the corrective device. Some cases attempt to classify whether the correction is achieved by the natural healing process, a transplant procedure, an artificial implant that cannot be removed by the patient, or a temporary prosthetic device to aid vision. We recognize that as medical technology advances, the distinction between some or all of these categories may become blurred. However, " '[a]ny change in the law due to medical advancements should come from the legislature, not from this Court.' " *Addy Asphalt Co. v. W.C.A.B. (Sebastianelli)*, 139 Pa. Commw. 593, 598, 591 A.2d 11, 13 (citations omitted), *appeal denied*, 528 Pa. 618, 596 A.2d 801 (1991).

In this case, Dr. Hensle identified several difficulties with an implant, aside from the possible complications, and testified that it is "not the same as the natural lens in the eye." This distinction has been recognized in other reported cases. For example, in *Kalhorn*, a case with almost identical facts, the Supreme Court of Nebraska stated as follows:

> [T]here is no evidence that such intraocular lenses will be risk-free in the future. Synthetic intraocular lenses are made of the same type of plastic material as are contact lenses. [Claimant's]

synthetic lens, just like a contact lens, was specially prepared for his . . . eye, but is expected to be a permanent replacement lens. The evidence shows that unlike a human lens, the plastic lens is monofocused, meaning that it focuses only at one distance. A human lens has the capability of changing its focus. The human lens differs from a plastic lens because the human lens has some ability to filter out light. The implant does not have any filtering powers. Therefore, the eye may become sensitive to bright light, according to expert testimony.

. . . .

[T]he purpose of eyeglasses and contact lenses is to refocus light rays properly onto the retina. This is called corrected vision. In [the treating ophthalmologist's] opinion, there is no distinction between the function of a contact lens or eyeglass lens and that of [claimant's] plastic lens implant.

*Kalhorn*, 227 Neb. at 885, 420 N.W.2d at 716.

"[M]edical technology may advance to where an intraocular lens implant eliminates the vision loss without difficulties or future risk. The record in this case does not reflect such advancement at this time. Based upon the record, at this time the implant cannot be considered as any more than a correction." *Id.* at 886, 420 N.W.2d at 717; *accord State ex rel. Kroger Co. v. Stover*, 31 Ohio St. 3d 229, 510 N.E.2d 356 (1987) (corneal transplant is a correction to vision and, thus, not considered in determining the percentage of vision actually lost by accident). *Contra Lee Connell Constr. Co. v. Swann*, 254 Ga. 121, 327 S.E.2d 222 (1985). We find the majority view compelling and adopt its reasoning.

From the evidence before us, we conclude that the claimant has suffered a "total loss of vision" in his right eye. The compensable injury suffered by the claimant required the removal of his natural lens. This procedure rendered him industrially blind. "The Legislature has not required that eye loss be determined on the basis of corrected vision and we have no authority to impose such a requirement." *Ranville v. J.T.S. Enters., Inc.*, 101 N.M. 803, 807, 689 P.2d 1274, 1278 (1984). The fact that claimant presently receives some benefit from a prosthetic device implanted within his eye does not establish that claimant's loss has been eliminated.

For these reasons, we affirm the commission's holding that the intraocular lens implant has not eliminated the loss that the claimant sustained, and, as a mere corrective device, the implant should not be considered in determining the extent of claimant's loss. Accordingly, we affirm.

*Affirmed.*

Barrow, J., and Willis, J., concurred.