PRESENT: Goodwyn, Mims, Powell, Kelsey, McCullough, and Chafin, JJ., and Millette, S.J.

LOUDOUN COUNTY

v. Record No. 190621

MICHAEL RICHARDSON

OPINION BY
JUSTICE WILLIAM C. MIMS
May 7, 2020

FROM THE COURT OF APPEALS OF VIRGINIA

In this case, we consider whether in setting the amount of workers' compensation

benefits Code § 65.2-503 requires that the extent of the worker's functional loss of use from a

work-related injury be measured before or after implantation of a prosthetic device that improves

the worker's functionality.

I. BACKGROUND AND MATERIAL PROCEEDINGS BELOW

Michael Richardson is fire battalion chief in the Loudoun County Fire & Rescue

Department. The injury at issue in this case occurred during a firefighter evaluation exercise on

July 10, 2013 during which Richardson experienced a sharp pain in his left groin area while

carrying a 40-pound hose up a flight of stairs. He was 55 years old at the time.

Following initial medical treatment, Richardson was referred to orthopedic surgeon Dr.

Anthony Avery. Avery conducted exploratory arthroscopic surgery on Richardson's hip on July

15, 2014 that revealed labral tearing and cartilage floating in the hip joint. Although

Richardson's condition improved in the following weeks, he complained to Avery of severe pain

in November 2014. Avery recommended hip replacement surgery, which took place in May

2015. Following that surgery, Avery determined that Richardson's loss-of-use rating was 11

percent.

In January 2017, Avery completed a report in response to a request to calculate

Richardson's level of impairment prior to the hip replacement surgery, determining that

Richardson had reached maximum medical improvement approximately three to four months after the July 15, 2014 arthroscopic surgery. He concluded that Richardson's condition was permanent and would only worsen without a total hip replacement. Based on his findings Avery determined that Richard's loss-of-use rating prior to the hip replacement surgery was 74 percent.

Richardson initially filed a claim for workers' compensation benefits based on 11 percent loss of use of his left leg on December 21, 2016, after the hip replacement surgery, but amended the claim on February 9, 2017 to reflect 74 percent loss of use prior to the implantation of the prosthesis. A Deputy Commissioner awarded Richardson permanent partial disability benefits on September 8, 2017, concluding that the proper measure for loss of use was the rating made prior to the hip replacement surgery. The Deputy Commissioner reduced Avery's initial 74 percent loss-of-use rating to 49 percent on the ground that certain arthritic conditions should not have been included in the rating. Richardson's employer, Loudoun County, appealed to the full Commission, and Richardson filed a cross-appeal challenging the reduction in the loss-of-use rating.

The full Commission unanimously affirmed the Deputy Commissioner's decision but modified the award to reflect the initial 74 percent loss-of-use rating. The Commission held that using a loss-of-use rating determined before corrective surgery that implants a prosthesis was the standard required by Code § 65.2-503 for Richardson's hip replacement. It accepted Avery's conclusion that Richardson was at maximum medical improvement before the surgery to implant the prosthetic hip.

The County appealed the Commission's decision to the Court of Appeals, which affirmed in a published opinion, *Loudoun County v. Richardson*, 70 Va. App. 169 (2019). The Court of Appeals held that, pursuant to the statute, loss of use is calculated before any surgery that

2

improves functionality by use of a prosthetic device. *Id.* at 178-79. It found that the Commission's award was proper because Avery's determination that Richardson had achieved maximum medical improvement before the hip replacement surgery was supported by credible evidence. *Id.* at 180-81.

We awarded Loudoun County this appeal.

## II. ANALYSIS

Loudoun County assigns error to the Court of Appeal's holding that Richardson's functional loss of use under Code § 65.2-503 is measured by the extent of his impairment before undergoing hip replacement surgery.

## A. History and Development of Loss-of-Use Determinations Under Code § 65.2-503

This case presents an issue of statutory interpretation. "Under well-established principles, an issue of statutory interpretation is a pure question of law which we review de novo." *Conyers v. Martial Arts World of Richmond, Inc.*, 273 Va. 96, 104 (2007) (quoting *Crawford v. Haddock*, 270 Va. 524, 528 (2005)). "When the language of a statute is unambiguous, we are bound by the plain meaning of that language." *Id.*

Code § 65.2-503(A) directs that a claimant will receive "[c]ompensation for permanent partial and permanent total loss and disfigurement." Before benefits are available under the statute, "it must appear both that the partial incapacity is permanent and that the injury has reached maximum medical improvement." *County of Spotsylvania v. Hart*, 218 Va. 565, 568 (1977). The statutory language does not directly address whether loss of use is measured before or after the surgical implantation of a prosthetic joint.

We first confronted a similar issue in the 1956 case of *Owen v. Chesapeake Corporation of Virginia*, 198 Va. 440 (1956). In that case, we held that under the predecessor statute to Code

3

§ 65.2-503, loss of use was measured based on the worker's uncorrected vision even though glasses improved his vision. *Id.* at 442. Owen lost visual acuity due to an industrial accident and began to require glasses to perform his work. *Id.* Previously he had only needed them for off-duty activities. *Id.* The Commission awarded Owen disability benefits based on his vision measured without the use of glasses. *Id.* at 441–42. On review, we upheld the Commission's finding, concluding that Owen's loss of use was measured "without recourse to the artificial aid" of glasses. *Id.* at 442.

The Court of Appeals later applied the *Owen* rule in *Creative Dimensions Group v. Hill*, 16 Va. App. 439 (1993), a case involving an intraocular lens implant. The parties agreed that Hill "had perfect vision" prior to a workplace accident, which caused him to develop a traumatic cataract in his right eye. *Id.* at 440. Corrective surgery that replaced the natural lens of Hill's eye with an intraocular lens implant significantly improved his vision. *Id.* at 441. The Commission awarded Hill benefits for the total loss of use of his right eye based on his vision prior to the transplant surgery. *Id.* at 440–41.

Hill's employer appealed to the Court of Appeals, which held that awarding benefits based on the condition prior to corrective surgery was consistent with the General Assembly's lack of action in response to *Owen*. *Id.* at 443–44. The Court of Appeals further noted that the corrective surgery was an imperfect substitute for Hill's natural vision and was accompanied by several risks. *Hill*, 16 Va. App. at 444–45. It emphasized that a claimant's benefit from a prosthetic device does not eliminate the fact of the bodily loss. *Id.* at 445. The Court of Appeals recognized that even if medical technology advanced to the point that prosthetics were indistinguishable from a claimant's natural condition and were without risk, the legislature rather than the judiciary is best positioned to change the law to reflect those advances. *Id.* at 444–45.

4

In 2002, the Workers' Compensation Commission applied *Hill*'s reasoning to award benefits to a claimant based on his loss of use before knee replacement surgery. *Rowe v. Dycom Indus., Inc*., VWC File No. 179-38-18 (Apr. 24, 2002). The issue facing the Commission in *Rowe* was the product of relatively new technology—joint replacement surgery—with no direct analog in the available precedent. The most similar line of cases was that of *Hill*, based on this Court's decisions in *Owen* and *Walsh Const. Co. v. London*, 195 Va. 810 (1954), involving eye injuries. The Commission held that intervening medical advances since those 1950s-era cases necessitated their application to a novel surgery that did not exist when they were decided. *Id.* at 6. Although *Hill* involved ocular rather than orthopedic impairment, that decision's logic nevertheless applied because there was no "meaningful distinction legally between an intraocular lens transplant and knee replacement." *Id.* at 5.

Just as with the lens transplant, the Commission emphasized that the implanted prosthesis could not replace the claimant's loss:

> [T]he actual loss has been occasioned by the original accident's degeneration and only by the grace of medical science is there a continued functioning. The claimant has lost the partial use of his leg but for steel, paraplastics, and mechanical engineering. Such is a permanent loss of use of part of his natural body.

*Id.* at 4. Moreover, it recognized that knee replacement surgery carried inherent risks, including the necessity for an additional surgery to replace the implant if it broke or wore out over time. *Id.* at 6. The knee replacement was an imperfect correction for the loss suffered through the claimant's work-related injury, one accompanied by additional risks and complications the claimant would not have to face but for that injury. The Commission therefore concluded that *Hill*'s holding applied to joint replacement surgeries such that the "true measure of a loss of use as envisioned by the General Assembly is a claimant's status at the time of the necessary

5

implantation of a mechanical device into the body of a claimant who is severely injured and has

reached maximum medical improvement (unaided by implanted prosthetics)." *Id.* at 3. Since

deciding *Rowe*, the Commission has consistently applied *Hill* to award benefits on the basis of

loss-of-use determinations made before implanting a prosthesis through corrective surgery,

including in this case.[1] *See, e.g.*, *Prasad v. DBHDS/N. Va. Mental Health Inst.*, VWC File No.

636-02-07, slip op. at 6 (Aug. 19, 2019); *Hicks v. Giant Landover Ahold U.S.A., Inc.*, VWC File

No. 967-53-01, slip op. at 6–7 (Sept. 24, 2018); *Orshoski v. Culpeper Reg'l Hosp.*, VWC File

No. 613-77-86, slip op. at 4 (Nov. 15, 2017); *Locksmith v. Chippenham Hosp.*, VWC File No.

183-93-44, slip op. at 6 (July 27, 2011); *Perkins v. Paramount Coal Corp.*, VWC File No. 187-

95-91, slip op. at 5 (Nov. 1, 2005); *Allen v. Alexandria Hosp.*, VWC File No. 207-31-38, slip op.

at 17–18 (Oct. 3, 2005).

B.  Operation of Code § 65.2-503 in the Present Case

    The purpose of the Workers' Compensation Act is to protect employees. Courts construe

it in a manner effectuating this remedial purpose. *See, e.g.*, *E.I. du Pont de Nemours & Co. v.

Eggleston*, 264 Va. 13, 17 (2002); *Ellis v. Commonwealth Dep't of Highways*, 182 Va. 293, 303

(1944). We hold that the Court of Appeals' interpretation of the statute is reasonable and

comports with this purpose.

---

[1] We note that the General Assembly apparently was aware of the Commission's *Rowe* decision shortly after it was rendered. During the 2003 session, Senator Thomas K. Norment, Jr. introduced a bill to require that maximum medical improvement be measured only after corrective surgery. The proposed language would have amended Code § 65.2-503 to clarify that maximum medical improvement is reached only "when the anatomical effects of injury or illness are permanent" and after "all reasonable and necessary medical interventions, *including but not limited to the implantation of artificial devices*, have occurred." S.B. 1130, Va. Gen. Assem. (Reg. Sess. 2003) (emphasis added). The bill was referred to the Senate Committee on Commerce and Labor but was stricken at Senator Norment's request. Since then, no other bills have been introduced to amend Code § 65.2-503 to clarify how prosthetics should factor into the loss of use determination.

Awarding compensation based on a pre-surgery loss-of-use rating recognizes that a work-related injury has permanently deprived the claimant of natural functionality. Although the procedure to implant a prosthetic hip joint is commonly called a total hip "replacement," the natural joint's function and ability to heal is irreplaceable.

> Joint arthroplasty replaces an organic (but failed) self healing system with an inorganic system subject to fatigue and wear. Currently available prostheses cannot compare with a natural joint in terms of longevity. Ultimately, all components wear or fatigue; consequently, a further (more complex) operation may be needed.

David F. Hamilton & Colin R. Howie, *Selecting the Right Hip Replacement*, 348 British Med. J. 1, 1 (Jan. 13, 2014) (doi: 10.1136/bmj.g46). Although the technology behind total hip replacements has advanced significantly since the procedure's introduction in the 1960s, the invasive procedure remains challenging for both doctors and patients. *See* Ian D. Learmonth et al., *The Operation of the Century: Total Hip Replacement*, 370 Lancet 1508, 1508–19 (2007). For surgeons, "the operation is technically demanding with a long learning curve," and despite generally excellent clinical outcomes for patients, "[c]omplications do occur . . . and include instability, aseptic loosening, periprosthetic fracture, infection, and occasionally death." Karl Michaëlsson, *Surgeon Volume and Early Complications After Primary Total Hip Arthroplasty*, 348 British Med. J. 1, 1 (May 23, 2014) (doi: :10.1136/bmj.g3433); *see also* 36 Am. Jur. Proof of Facts 2d *Hip Injuries* § 16 (listing potential complications from total hip replacement surgery).

Moreover, the procedure comes with the expectation that the prosthetic will eventually fail and require subsequent surgical revision. *See* Muyibat A. Adelani et al., *What is the Prognosis of Revision Total Hip Arthroplasty in Patients 55 Years and Younger?*, 472 Clinical Orthopaedics & Related Res. 1518, 1518–19 (2014) (doi: 10.1007/s11999-013-3377-9). To reduce the need for revision or risk of other complications, patients receiving total hip

7

replacements are generally subject to permanent restrictions on their activities. In this case,

Avery recited a litany of limitations Richardson would have to observe for the rest of his life:

> [I]n a younger person like him I would try to get him to refrain from sports to try to prevent it from wearing out at a young age. I wouldn't want him to be a runner. I wouldn't want him to go water skiing or snow skiing. He has to be conscious of the position that his leg is in for the rest of his life so that it does not dislocate. Dislocation is always a risk even many years out. And then heavy weightlifting, I wouldn't want him to do heavy powerlifting due again to the fact that the hip can wear out. And in a young person like him you want to do everything possible to make it last forever.

Notably, studies have found that young patients whose initial total hip replacements failed and required surgical revision have historically experienced high failure rates of the revised hip replacements. Those failures result in a need for additional revision surgeries and a high incidence of complications such as hospital readmission, instability, and increased mortality. Muyibat A. Adelani et al., *supra* at 1524 (collecting studies).[2]

---

[2] Total hip replacement surgery was originally developed as a procedure for elderly patients with low activity levels. Historically, young patients—that is, those less than 65 years old—"have been considered at higher risk for revision due to their higher activity level relative to elderly patients." Steven M. Kurtz et al., *Future Young Patient Demand for Primary and Revision Joint Replacement*, 467 Clinical Orthopaedics & Related Res. 2606, 2606 (2009) (doi: 10.1007/s11999-009-0834-6).

> By the year 2030, it is estimated that more than 25% of all [total hip arthroplasties ("THA")] will be placed in patients under the age of 55. However, the outcome of THA in these young patients is inferior compared with older patients. The main complications after THA include dislocation, infection, and loosening of the femoral or acetabular component. Young patients will outlive their prosthesis due to longer life expectancy, and survival at mid- and long-term is lower in patients younger than 55 years when compared with older patients.

M.F.L. Kuijpers et al., *The Risk of Revision After Total Hip Arthroplasty in Young Patients Depends on Surgical Approach, Femoral Head Size and Bearing Type*, 20 BMC Musculoskeletal Disorders 385, 385 (2019) (doi: 10.1186/s12891-019-2765-z).

Requiring that loss of use be measured only after corrective surgery would omit these intangible costs from the compensation calculation. It also would have the effect of forcing injured workers to undertake an invasive, risky surgery with a nontrivial possibility of complications requiring additional surgeries in order to be eligible for compensation.[3] Instead, the interpretation unanimously employed by the Commission and Court of Appeals acknowledges the irreplaceable loss of the claimant's natural joint, the nonmonetary costs associated with the corrective surgery, and the permanent restrictions on the claimant's activities resulting from the work-related injury.

For nearly two decades, the Commission has consistently applied this interpretation to award benefits for loss of use measured before joint replacement surgery. It has based these decisions upon our precedent that dates back more than a half-century. Jurisprudential stability favors upholding the reasonable interpretation of Code § 65.2-503 employed by the Commission and Court of Appeals that employees have long relied on and that employers have long understood.[4] We recognize the wisdom in leaving undisturbed "[t]hat construction which for a

---

[3] The apparent logical conclusion of the County's argument that maximum medical improvement can only be determined after undergoing an available corrective surgery is that claimants may not receive compensation unless they consent to that surgery.

[4] This is particularly so where, as here, the General Assembly apparently was aware of the Commission's interpretation. Courts generally presume that the legislature is cognizant of the construction accorded a statute by the public officials charged with its application, and when that construction "has long continued without change the legislature will be presumed to have acquiesced therein." *Peyton v. Williams*, 206 Va. 595, 600 (1965). We have observed, however, that this presumption "presupposes knowledge of the administrative construction. Without publication of the construction placed upon the statute . . . no presumption of legislative acquiescence attaches." *Commonwealth v. Champion Int'l Corp.*, 220 Va. 981, 992 (1980). For this sound reason, the doctrine ordinarily applies only to those decisions made by a jurisdiction's court of last resort, of which the legislature is presumed to have knowledge. *See, e.g.*, *Perkinson v. Perkinson*, 989 N.E.2d 758, 763 (Ind. 2013) ("[F]ailure of the Legislature to change a statute after a line of decisions of a court of last resort giving the statute a certain construction, amounts to an acquiescence by the Legislature in the construction given by the court, and that such construction should not then be disregarded or lightly treated."). In this unusual and perhaps

9

long period of time has been accepted by bench and bar as the true construction of a statute," particularly as no "paramount reason [has been] advanced for a change of the conclusion." *Miller v. Commonwealth*, 180 Va. 36, 41 (1942) (quoting *St. Joseph's Soc. v. Virginia Tr. Co.*, 175 Va. 503, 511 (1940)).

## C. The County's Objections are Unpersuasive

The County argues that the Commission's construction of Code § 65.2-503 creates a windfall for claimants by allowing them to receive, at the employer's expense, full benefits for their pre-surgery loss of use as well as the benefit of a prosthetic joint that restores most of their physical functionality. It contends that the General Assembly indicated that it did not intend this windfall by enacting Code § 65.2-708, which provides for a review of benefits within two years of a surgery to repair or replace a prosthesis. In the County's view, the Workers' Compensation Act already insulates claimants from the concerns expressed in *Rowe* and *Hill* regarding worn-out prostheses: Code § 65.2-603 requires employers to cover the initial joint replacement surgery, and Code § 65.2-708 requires employers to cover any increased needs resulting from subsequent surgeries "to repair or replace a prosthesis or orthosis" even years after the initial surgery, a protection not afforded to other types of claimants. Because the General Assembly has already addressed the concerns motivating the decision below, the County argues, this Court should decline to grant claimants the windfall of a pre-surgery loss-of-use determination.

The County's argument, however, overstates the function of Code § 65.2-708. That statute merely extends the ordinary two-year statute of limitations for seeking review of a compensation award to include an additional two-year period following a subsequent revision

---

unprecedented circumstance, however, legislation clearly drafted to overrule the Commission's *Rowe* decision was introduced in the General Assembly, evincing knowledge of the Commission's construction.

10

surgery to repair or replace a prosthesis. Far from being a roundabout legislative bar on pre-surgical loss-of-use determinations, Code § 65.2-708 instead reflects the General Assembly's recognition that an artificial joint replacement is an imperfect treatment for a compensable injury that often requires subsequent revision surgeries. But for the work-related injury to the natural joint, the claimant would not have to undergo the initial replacement surgery and subsequent revision surgeries, each of which is accompanied by its own risks and costs not addressed by the Act. The Code § 65.2-708 review process for joint replacements acknowledges the reality of the concerns raised in *Hill* and *Rowe*, but it does not alleviate them. The Commission's interpretation of the Act thus does not create a windfall placing claimants in a better position than they were in prior to their injuries, but rather ensures that they receive adequate compensation for injuries requiring replacement of their biological joints with imperfect artificial prostheses and the risks accompanying that procedure.

The County also contends that the Court of Appeals inappropriately expanded the interpretation of "maximum medical improvement" beyond our previous holding in *Hart*, 218 Va. at 565. In that fact-bound case, this Court held that a claimant had not reached maximum medical improvement when surgery was an option to repair his arm from a gunshot wound. *Hart*, 218 Va. at 570. The claimant, however, was never examined by a physician to determine whether he had actually reached maximum medical improvement. *Id.* at 567. Instead, the Commission "merely assumed that Hart's injury had reached maximum improvement" and then acted on that assumption. *Id.* at 569. This Court rejected the Commission's conclusion because even if it had made a finding, that finding "would be based upon speculation and not upon evidence." *Id.* at 569–570. In the absence of factual findings, we concluded that "[g]iven the facts of this case, until the doctors had decided against surgery for Hart, or surgery had been

performed and its outcome had become known, it could not be determined whether Hart's arm injury had reached maximum medical improvement." *Id.* at 570.

In contrast to *Hart*, the record in this case contains factual findings regarding Richardson's maximum medical improvement that are supported by credible medical evidence. Avery examined Richardson before undergoing hip replacement surgery, and based on that examination, concluded that Richardson had a 74 percent loss-of-use rating constituting maximum medical improvement prior to corrective surgery. The Commission accepted Avery's determinations as "credible and reliable" based on his "extensive" treatment of Richardson. Because these factual findings are supported by credible evidence, we accept them on appeal. *James v. Capitol Steel Constr. Co.*, 8 Va. App. 512, 515 (1989).

### III.  CONCLUSION

The Court of Appeals did not err in affirming the Commission's award based on Code § 65.2-503 for Richardson's loss of use before hip replacement surgery. Accordingly, we affirm the decision of the Court of Appeals.

*Affirmed.*

JUSTICE KELSEY, with whom JUSTICE POWELL joins, dissenting.

Michael Richardson sustained a hip injury that, if left untreated, would have deprived him of 74% of the normal use of his left leg. But the injury was treated — quite successfully in fact. Richardson's employer paid for a total hip replacement that restored 63% of the use of his leg, leaving him with an 11% permanent loss of use of his leg. None of this matters, Richardson contends, because the Workers' Compensation Act requires us to hold that he *continues* to suffer a 74% *permanent* loss of use of his leg when clearly he does not. Richardson stitches together a patchwork of arguments in support of his thesis. I find none of them persuasive.

12

I.

The treating physician who performed Richardson's hip-replacement surgery used the fifth edition of the American Medical Association Guides to the Evaluation of Permanent Impairment to determine Richardson's 11% permanent-partial-impairment rating. *See* J.A. at 52, 70-72, 79.6-79.7. Virginia courts recognize and approve the Workers' Compensation Commission's "longstanding practice of accepting the American Medical Association's impairment guidelines" as a credible baseline for impairment ratings. *See Fairfax Cty. Sch. Bd. v. Martin-Elberhi*, 55 Va. App. 543, 547 (2010).

The AMA Guides to the Evaluation of Permanent Impairment require the patient to reach maximum medical improvement *prior to* the physician assessing the permanency of the patient's impairments: "An impairment should not be considered permanent until the clinical findings indicate that the medical condition is static and well stabilized, often termed the date of maximal medical improvement (MMI). . . . Once an impairment has reached MMI, a permanent impairment rating may be performed." American Medical Association, Guides to the Evaluation of Permanent Impairment § 2.4, at 19 (Linda Cocchiarella & Gunnar B.J. Andersson eds., 5th ed. 2001) [hereinafter AMA Guides] (emphasis omitted). "Maximal medical improvement refers to a date from which further recovery or deterioration is not anticipated, although over time there may be some expected change." *Id.* "The [AMA] Guides attempt[] to take into account all relevant considerations in rating the severity and extent of permanent impairment and its effect on the individual's activities of daily living." *Id.*

This methodology tracks Virginia law. Under settled principles, no award of permanent-partial-disability benefits can be made "until the injury has reached a state of permanency, i.e. maximum improvement, when the degree of loss may be medically ascertained." *County of*

13

*Spotsylvania v. Hart*, 218 Va. 565, 568 (1977) (citation omitted). "In other words," no such benefits can be calculated or awarded until the claimant proves "both that the partial incapacity is permanent and that the injury has reached maximum medical improvement." *Id.* A claimant reaches maximum medical improvement when "no reasonable expectation exists that [he] will obtain further functional improvement from medical treatment, even though the injury remains symptomatic and disabling." *Gunst Corp. v. Childress*, 29 Va. App. 701, 707 (1999).

In this case, the treating physician concluded that Richardson had reached maximum medical improvement *because of the surgery*. *See* J.A. at 71 (agreeing that Richardson was at "maximum medical improvement post hip replacement surgery"). In his post-hip-replacement report, the physician concluded that, "according to the AMA guidelines," Richardson "ha[d] a permanent partial impairment rating of 11%." *Id.* at 52; *see also id.* at 70-72. The 11% rating was "an accurate number," the physician agreed, "for [Richardson's] post surgery *permanent* impairment." *Id.* at 71-72 (emphasis added). The treating physician's opinion on this point was incontestable. Richardson presented no medical evidence suggesting that the hip replacement will likely fail sometime in the future, that post-operative complications render the 11% rating speculative, or that modern hip replacements are so medically unreliable that any post-operative impairment rating should discount their efficacy.

To restate the obvious, the treating physician believed that Richardson will *permanently* suffer *only* an 11% loss of use of his leg as a result of his workplace accident. This conclusion cannot be correct, Richardson argues, because his temporary 74% impairment rating (measuring his condition from the time of his injury to the time of his successful hip replacement) supersedes his permanent 11% impairment rating (measuring his condition from the time of his recuperation

14

from hip-replacement surgery into perpetuity). It is difficult to follow how this temporary-to-permanent transposition takes place, but the argument begins with a hypothetical storyline.

A. THE HYPOTHETICAL FACTUAL NARRATIVE

Richardson's counsel filed a claim for permanent-partial-disability benefits based upon the physician's 11% impairment rating. *See id.* at 51 (claiming "11% left leg"). Counsel later asked the physician a purely hypothetical question: What would Richardson's impairment rating be *if he had never had the hip-replacement surgery*? Asking the question this way, Richardson's counsel wanted the physician to hypothesize that the surgery had never taken place. The physician answered counsel with the observation that Richardson would have had a 74% *permanent* loss of use if he had lived the rest of his life "*without* a total hip replacement." *See id.* at 54 (emphasis added). Saddled with counsel's required hypothesis, the physician merely said that Richardson "would have *continued* to be incapacitated" at the 74% rating *if* he had never undergone the hip-replacement surgery. *See id.* (emphasis added). Put another way, Richardson's 74% incapacity would have been permanent had it not been temporary.

But, hypotheticals aside, it was temporary. Upon reaching maximum medical improvement after his hip-replacement surgery, Richardson regained 63% of the use of his leg, leaving him with an 11% permanent impairment rating. *See id.* at 52, 70-72. Taken together, the physician's two opinions can mean only one thing: Richardson's pre-hip-replacement condition (resulting in a 74% loss of use) was temporary because it was permanently improved (to an 11% loss of use) by the hip-replacement surgery.

The factual record fully supports both the temporary 74% rating prior to the hip replacement and the permanent 11% rating after the hip replacement. Prior to the hip replacement, the physician agreed, Richardson's "pain and his function was at a point where he

15

just couldn't live with it any more," *id.* at 76, and he also testified that "there were cartilage pieces and debris everywhere" in Richardson's hip, *id.* at 77. The physician reported that Richardson "was using a cane occasionally" and had suffered from gait and range-of-motion deficiencies, "a lot of strength deficit," and arthritis. *Id.* at 79.5. The physician noted that he "could barely move [Richardson's] leg without him jumping off the table in pain." *Id.* at 79.16. Richardson testified that chronic pain had kept him from wanting to be "involved in any type of physical activity." *Id.* at 98. "I couldn't sit for any period of time," he stated, "I couldn't stand for any period of time." *Id.*

None of these disabling conditions existed after Richardson had reached maximum medical improvement. "[H]e was doing fine" after the hip-replacement surgery, the physician reported. *Id.* at 79. "He had no significant neurologic deficit," no reported complaints of debilitating pain, and only a "mild" limitation on range of motion. *Id.* at 52. The only deficit that the physician observed was "significant weakness with [Richardson's] hip flexion and knee extension strength." *Id.* These specific concerns were factored into the lifelong precautions that the physician counseled Richardson to take, such as not becoming a "runner" or engaging in "heavy weightlifting," "water skiing[,] or snow skiing." *See id.* at 79-79.1; AMA Guides, *supra*, § 2.4, at 19 ("The Guides attempt[] to take into account all relevant considerations in rating the severity and extent of permanent impairment and its effect on the individual's activities of daily living."). Richardson had no limitations, however, on walking or hiking, including, for example, hiking the Appalachian Trail. *See* J.A. at 79.1.

In short, the successful hip-replacement surgery liberated Richardson from a crippling and painful condition that had prevented him from wanting to engage "in any type of physical activity" and from being able to stand or sit "for any period of time," *id.* at 98, and provided him

16

freedom from chronic, debilitating pain and the ability to hike the Appalachian Trail, *see id.* at 79.1. That is quite an improvement — a maximum medical improvement to be sure. The only remaining question is whether that improvement was temporary or permanent. The treating physician concluded, without contradiction, that it was permanent. No expert testimony or medical evidence refuted the physician's opinion.

Seeking to cast doubt on the physician's 11% impairment rating, the majority reopens the evidentiary record to consider a host of factual assertions and hearsay expert opinions offered in articles published in various medical journals. None of these assertions can be found in the record of this case. Neither party referred to these articles in their briefs or arguments before the deputy commissioner, the full Commission, the Court of Appeals, or this Court. Even so, the majority cites these articles in support of its assertion that Richardson's hip replacement may ultimately fail, and if that happens, future surgeries "may be needed," *ante* at 7 (citation omitted). The majority also states that while hip-replacement surgery generally produces "excellent clinical outcomes for patients," sometimes "complications do occur." *Ante* at 7 (alteration and citation omitted). Even when the surgery is wholly successful, patients "are generally subject to permanent restrictions on their activities." *Ante* at 7-8.

The apparent purpose of taking judicial notice of these articles is to imply that, as a matter of law, a medical expert can never give a truly reliable opinion on a patient's permanent impairment following a hip-replacement surgery. By turning a blind eye to any post-hip-replacement impairment ratings by medical experts, only one option remains — a pre-hip-replacement impairment rating that wholly ignores any improvements in the patient's condition because of the hip replacement. Under this view, even though the procedure provides the patient

17

with maximum medical improvement, the impairment rating must be calculated on the false assumption that there was no improvement at all.

The present case highlights the unconvincing nature of this reasoning: Despite the fact that after his hip replacement he was doing well enough to hike the Appalachian Trail, *see* J.A. at 79.1, Richardson claims that his impairment rating must revert back to his pre-hip-replacement condition of being prevented by chronic pain from standing or sitting "for any period of time" or from wanting to engage "in any type of physical activity," *id.* at 98. The majority agrees. Established caselaw, the majority argues, says as much, and the General Assembly has agreed by its silence. I find both assertions unpersuasive.

### B. THE CLARITY OF *OWEN* & THE CONFUSED RESPONSE TO IT

The majority ties together a line of opinions from this Court, the Court of Appeals, and the Commission to support the assertion that a hip-replacement surgery, as a matter of law, can never constitute a maximum medical improvement, which is a precondition to any award of permanent, partial disability, *see Hart*, 218 Va. at 568.[1]

The majority's reasoning begins with *Owen v. Chesapeake Corp. of Virginia*, a case involving a worker who "suffered caustic acid burns to both eyes," which caused him to have "industrial blindness" as a result of a loss of vision in both eyes. 198 Va. 440, 441 (1956). We found that the employee's impairment rating should not take into account eyeglasses that could improve his vision. *See id.* at 442. Implicit in this holding was the truism that giving a worker a pair of prescription eyeglasses could hardly constitute a maximum medical improvement. The

---

[1] *See also* 6 Arthur Larson et al., Larson's Workers' Compensation Law § 80.04, at 80-13 (2019); 15 Virginia Practice Series: Workers' Compensation § 26:1, at 277 (2019-2020 ed.).

worker would immediately return to near total blindness as soon as he misplaced the glasses or accidentally dropped them on the floor.

The majority reasons that a hip-replacement surgery cannot be deemed a maximum medical improvement any more than a pair of prescription glasses could in *Owen*. I do not see the logic of this argument. No doctor or patient would say that a hip-replacement surgery is not "medical," or not an "improvement" if it was helpful, or not a "maximum medical improvement" if it achieved the best result that one could hope for. Richardson received, as his treating physician testified, a medical improvement in his condition because of the hip-replacement surgery. And it was the best (that is, the maximum) improvement that medical science had to offer him.

The majority cites opinions from the Court of Appeals and the Commission ostensibly relying upon *Owen*. One Court of Appeals opinion deserves special attention because Richardson uses it as the fulcrum of his argument. In *Creative Dimensions Group, Inc. v. Hill*, a worker developed a cataract in one eye as a result of a work injury, and a surgeon replaced his natural eye lens with an intraocular lens implant, thereby improving the worker's vision in that eye. *See* 16 Va. App. 439, 440-41 (1993). The medical evidence in the case, however, established that the intraocular lens implant "was not truly 'permanent.'" *Id.* at 442. The treating physician itemized "the major problems associated with this procedure," including:

> (1) retinal detachment; (2) cystoid macular edema; (3) secondary cataract or membranous cataract (a clouding of the membrane used to hold back the vitreous gel); (4) implant dislocation; (5) infection, either acute or slow endophthalmitis (which might necessitate removal); (6) glare or inflammation caused by the implant itself; and (7) damage to the cornea or angle of the eye bringing out glaucoma.

*Id.* at 442 n.3. Surveying out-of-state cases specific to eye injuries, the Court of Appeals held that the Commission had had a sound factual basis for finding that the lens implant had put the

19

worker at risk of "major problems" and thus had not permanently improved his injured eye. *See id.* at 442-46 & n.3. The very nature of the lens implant and the procedure, the treating physician testified, demonstrated that the remedy was temporary. *See id.* at 442 & n.3.

We need not strain to see the difference between the present case and *Hill*. In the present case, Richardson's treating physician testified that the hip replacement had permanently restored Richardson's use of his leg. No evidence suggested that the hip replacement would eventually fail, causing Richardson to revert to his prior condition. Nor did any evidence disclose any major problems with this procedure. By contrast, the treating physician in *Hill* testified that the intraocular lens implant presented the risk of multiple "major problems" and, as a result, could not be considered a permanent restoration of the claimant's eyesight. *See id.*

Treating this dispositive dissimilarity as insignificant, Richardson reconstitutes the holding of *Hill* into an axiomatic rule of law. The majority adopts it in full. *See ante* at 4-6. That rule can be succinctly stated as follows:

> When determining maximum medical improvement for purposes of calculating permanent losses compensable under § 65.2-503 of this Title, the medical use of a surgically implanted "prosthetic device" shall be excluded from consideration even if it is a medical improvement that maximizes the claimant's capacity to use the damaged body part.

This judicially crafted rule of law looks a lot like a statutory provision and functions very much like one. Perhaps it could be excused if it were an accurate restatement of "our precedent that dates back more than a half-century," *ante* at 9. But if "our precedent," *ante* at 9, means decisions of *our* Court, there simply are none.

## C. THE LEGISLATIVE-ACQUIESCENCE PRESUMPTION

Offering nothing in our precedent supportive of the prosthetic-device exception, the majority retreats to the cover of the legislative-acquiescence presumption. According to two

footnotes in the majority opinion, an "unusual and perhaps unprecedented circumstance," *ante* at 9-10 n.4, proves that the General Assembly has specifically endorsed the prosthetic-device exception to the maximum-medical-improvement doctrine. The intended implication is that holding otherwise would impermissibly defy the legislative will and undermine "[j]urisprudential stability," *ante* at 9. I respectfully disagree.

The story of this "unusual and perhaps unprecedented circumstance," *ante* at 9-10 n.4, begins 17 years ago, after the Commission issued an opinion applying the logic of *Hill* to prosthetic joint replacements.[2] A legislator unsuccessfully introduced a bill in the General Assembly clarifying that maximum medical improvement could only be "reached when the anatomical effects of injury or illness are permanent and all reasonable and necessary medical interventions, *including but not limited to the implantation of artificial devices*, have occurred," S.B. 1130, Va. Gen. Assem. (Reg. Sess. 2003) (emphasis added). *See ante* at 6 n.1. Because the bill never passed, the majority asserts that the General Assembly implicitly endorsed the prosthetic-device exception. We know this to be true, the majority says, because the legislature "apparently" considered the proposed legislation and rejected it on the merits. *See ante* at 6 n.1, 9-10 n.4.

I do not find that conclusion apparent at all. It is far more likely that what happened with this bill 17 years ago has nothing to do with this case, which explains why Richardson, the employer, the deputy commissioner, the full Commission, and the Court of Appeals never mentioned it. Neither house of the General Assembly ever voted on the bill. No committee or

---

[2] *See Rowe v. Dycom Indus., Inc.*, VWC File No. 179-38-18, 2002 WL 847855, at *3 (Apr. 24, 2002) (finding the decision of the Court of Appeals in *Hill* to be "controlling" and to forbid the consideration of implanted corrective devices in "orthopedic cases," concluding that there is no "meaningful distinction legally between an intraocular lens transplant and knee replacement").

21

subcommittee of either chamber heard arguments or testimony concerning the bill. No one spoke in favor of or against it. No legislator in the General Assembly cast a single vote for or against this bill. Instead, the patron withdrew the bill without comment shortly after the legislative session had begun. I fail to see how this bill, filed and promptly withdrawn 17 years ago, can shut down our judicial duty "to say what the law is," *Howell v. McAuliffe*, 292 Va. 320, 350 (2016) (quoting *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 177 (1803)), and oblige us to presume that the legislature has implicitly folded into the text of the Workers' Compensation Act a legal theory with no textual support.

Without that withdrawn bill, there can be no persuasive basis for invoking the legislative-acquiescence presumption. Our only cases relevant to this subject, *Hart* and *Owen*, do not mention, much less support, the prosthetic-device exception. The only other possible predicate for the presumption is a misreading of *Hill*, a Court of Appeals decision, and the opinion of the Commission that found it "controlling," *see supra* note 2. Neither of these opinions, however, can support the presumption of legislative acquiescence.

The legislative-acquiescence presumption applies in full force only to decisions of courts of last resort, not intermediate or lower courts. *See Southwestern Paint & Varnish Co. v. Arizona Dep't of Envtl. Quality*, 976 P.2d 872, 875 (Ariz. 1999) (en banc) ("[T]he principle of legislative acquiescence applies only where a statute has been construed by the court of last resort, not an intermediate appellate court.").[3] No intermediate or lower court binds, directly or indirectly, a

_____

[3] *See also Hefner v. White*, 47 N.E.2d 964, 965 (Ind. 1943) ("[T]he failure of the Legislature to change a statute after a line of decisions *of a court of last resort* giving the statute a certain construction amounts to an acquiescence by the Legislature in the construction of the court . . . ." (emphasis added)); *Commonwealth v. Trousdale*, 181 S.W.2d 254, 256 (Ky. 1944) ("It is a generally recognized rule of statutory construction that when a statute has been construed *by a court of last resort* and the statute is substantially re-enacted, the Legislature may be regarded as adopting such construction." (emphasis added)); *United States v. Streidel*, 620

court of last resort.  Until a court of last resort rules on a specific issue, it remains open for any litigant to seek an ultimate appeal to that court after receiving an adverse ruling from a lower or intermediate court on the issue.  For this reason, we rarely presume that the General Assembly treats decisions of the Court of Appeals as the final judicial word on Virginia law that necessitates, if considered erroneous, a legislative response.[4]

It necessarily follows that we should not presume that Commission decisions wholly governed by "controlling" precedent from the Court of Appeals, *see supra* note 2, bind us on the theory that the General Assembly has silently endorsed the Commission's expert interpretative judgment.  If a decision of the Court of Appeals does not warrant application of the legislative-acquiescence presumption, then neither can a decision of a subordinate tribunal that is duty

---

A.2d 905, 914 n.12 (Md. 1993) (noting that the principle of legislative acquiescence "has little or no applicability when the judicial construction of the statute is not by the highest court of the jurisdiction involved"), *superseded by statute on other grounds*, Judgments — Limitations on Noneconomic Damages Act, ch. 477, 1994 Md. Laws 2292 (codified as amended at Md. Code Ann., Cts. & Jud. Proc. §§ 11-108 to -109 (1995)); *Handlin v. Morgan Cty.*, 57 Mo. 114, 116 (1874) ("[W]here a *court of last resort* construes a statute, and that statute is afterwards re-enacted, or continued in force, without any change in its terms, it is presumed that the legislature adopted the construction given to it by the court." (emphasis added)); *Mechanics Fin. Co. v. Austin*, 86 A.2d 417, 420 (N.J. 1952) (noting that the previous decision allegedly acquiesced in "was not the interpretation of the court of last resort"); Henry Campbell Black, Handbook on the Construction and Interpretation of the Laws § 93, at 298 (2d ed. 1911) ("And after the enactment of a statute, when a construction has been placed upon it by the *highest court of the state*, it will be steadily adhered to . . . and more especially . . . where it has been acquiesced in by the legislature for a succession of years." (emphasis added)).

[4] I am aware of only two examples where this Court has relied upon a decision of the Court of Appeals as a predicate for the legislative-acquiescence presumption. *See Barson v. Commonwealth*, 284 Va. 67, 74 (2012); *Weathers v. Commonwealth*, 262 Va. 803, 805 (2001). Both opinions merely assume, without any analysis, the doctrine's applicability to decisions of the Court of Appeals.  More recently, however, we reversed a decision of the Court of Appeals in which that court had explicitly relied upon its own precedent to establish legislative acquiescence. *See Luttrell v. Cucco*, 291 Va. 308, 318 (2016) (reversing the Court of Appeals without mentioning that court's reliance upon legislative acquiescence to one of its own decisions in *Luttrell v. Cucco*, Record No. 1768-14-4, 2015 WL 1782065, at *5 (Apr. 21, 2015) (unpublished)).

bound to follow the higher court's precedent. That scenario is exactly the one that we face here. Every Commission decision applying the alleged prosthetic-device exception — from *Rowe* to the Commission's decision in this case — simply followed, either directly or indirectly, the binding precedent that the Court of Appeals had established in *Hill*.[5]

Stretching the legislative-acquiescence presumption to fit this odd context is imprudent, as the doctrine is speculative enough on its own terms. *See United States v. Wells*, 519 U.S. 482, 495-96 (1997) (commenting that "it is at best treacherous to find in congressional silence alone the adoption of a controlling rule of law" (alteration and citation omitted)). Even when it is applicable, the presumption is an "exceedingly poor indicator of legislative intent" and "a highly disfavored doctrine of statutory construction" because "sound principles of statutory construction require that . . . courts determine the Legislature's intent from its *words*, not from its silence." *Donajkowski v. Alpena Power Co.*, 596 N.W.2d 574, 581-83 (Mich. 1999) (emphasis in original). The presumption, moreover, is at its weakest when it relies upon precedent from any court other than the highest court authorized to decide the issue. *See Jones v. Liberty Glass Co.*,

---

[5] *See Prasad v. DBHDS\N. Va. Mental Health Inst.*, Jurisdiction Claim No. VA00001243671, 2019 WL 4014162, at *3-4 (Va. Workers' Comp. Comm'n Aug. 19, 2019); *Hicks v. Giant Landover*, Jurisdiction Claim No. VA01002424518, 2018 WL 4680652, at *3-4 (Va. Workers' Comp. Comm'n Sept. 24, 2018); *Richardson v. Loudoun Cty.*, Jurisdiction Claim No. VA00000806147, 2018 WL 4523188, at *7 n.3 (Va. Workers' Comp. Comm'n Sept. 11, 2018); *Orshoski v. Culpeper Reg'l Hosp.*, Jurisdiction Claim No. VA00000800421, at *2-3 (Va. Workers' Comp. Comm'n Nov. 15, 2017); *Locksmith v. Chippenham Hosp.*, JCN 183-93-44, 2011 WL 3251417, at *3-4 (Va. Workers' Comp. Comm'n July 27, 2011); *Liming v. Venezia Transp. Serv., Inc.*, VWC File No. 227-66-84, 2009 WL 3119696, at *1-4 (Va. Workers' Comp. Comm'n Sept. 29, 2009); *Estate of Allen v. Alexandria Hosp.*, VWC File No. 207-31-38, 2005 WL 2998009, at *10-11 (Va. Workers' Comp. Comm'n Oct. 3, 2005); *Wheeler v. United Parcel Serv. of Am.*, VWC File No. 191-89-10, 2004 WL 377394, at *7 (Va. Workers' Comp. Comm'n Feb. 3, 2004) (per curiam); *O'Neal v. Ogden Aviation Servs.*, VWC File No. 189-30-02, 2001 WL 1575322, at *3 (Va. Workers' Comp. Comm'n Nov. 6, 2001); *Fife v. Diamond Hill Plywood Co.*, 94 O.I.C. 157-79-41, VWC File No. 157-79-41, 1994 WL 1038980, at *1 (Va. Workers' Comp. Comm'n May 2, 1994) (per curiam).

332 U.S. 524, 533-34 (1947) ("[T]he doctrine of legislative acquiescence is at best only an auxiliary tool . . . . We do not expect Congress to make an affirmative move every time a lower court indulges in an erroneous interpretation."). Applying the presumption to this case, whether to decisions of the Court of Appeals or the Commission, merely piles one interpretative inference upon another.

The majority ends its legislative-acquiescence discussion with an appeal to tradition: The prosthetic-device exception has "for a long period of time . . . been accepted by bench and bar as the true construction of" the Workers' Compensation Act, *ante* at 9-10 (citation omitted), and thus, we should defer to this interpretative unanimity. I respect the sagacity of this observation but question its relevance to this case. If the prosthetic-device exception were as widely known as the "true construction of [the] statute" as the majority claims, *ante* at 9-10 (citation omitted), one would expect to find few or no cases involving impairment ratings determined *after* prosthetic-device surgeries. But there are quite a few, and none makes any mention of the post-surgery rating violating a universally held interpretation of the Workers' Compensation Act. *See, e.g.*, *Martin-Elberhi*, 55 Va. App. at 545, 547-48 (collecting cases); *Virginia Nat. Gas, Inc. v. Tennessee*, 50 Va. App 270, 275-76 (2007); *Trevathan v. Loudoun Cty. Sch. Bd.*, JCN 240-63-68, 2012 WL 6087248, at *1 (Va. Workers' Comp. Comm'n Dec. 3, 2012); *Street v. Burress*, VWC File No. 180-15-95, 2002 WL 847857, at *5-6 (Va. Workers' Comp. Comm'n Apr. 25, 2002) (per curiam); *Myers v. Carpet Corp.*, 64 O.I.C. 239, Claim No. 109-34-18, 1985 WL 307321, at *1-2 (Va. Indus. Comm'n June 5, 1985).[6]

_____

[6] There are several tertiary arguments in the majority opinion that I find unconvincing. One in particular is the assertion that "[t]he apparent logical conclusion of the County's argument that maximum medical improvement can only be determined after undergoing an available corrective surgery is that claimants may not receive compensation unless they consent to that surgery," *ante* at 9 n.3. This assertion is inaccurate. Under Virginia law, a claimant has a

II.

In sum, this case is far simpler than our point-counterpoint arguments might suggest. Under Virginia law, an impairment rating for permanent-partial-disability benefits must be determined after the claimant reaches maximum medical improvement. Richardson reached maximum medical improvement as a result of his hip-replacement surgery and, after recuperating from that surgery, suffered only an 11% permanent loss of use of his left leg. There is no basis in the Workers' Compensation Act, or any interpretation of it by this Court, for a prosthetic-device exception to the maximum-medical-improvement doctrine.

I respectfully dissent.

---

right to reasonably refuse to undergo surgery without any impact on his right to claim benefits under the Workers' Compensation Act. *See* Code § 65.2-603(B); *Chesapeake Masonry Corp. v. Wiggington*, 229 Va. 227, 232 (1985); *Stump v. Norfolk Shipbuilding & Dry Dock Corp.*, 187 Va. 932, 938-39 (1948). *See generally* Lawrence J. Pascal, Virginia Workers' Compensation Law and Practice § 6.03[1][a]-[b], at 6-12 to -16 (4th ed. 2011 & Supp. 2019); Kent Sinclair & Charles E. Friend, Personal Injury Law in Virginia § 24.14, at 24-92 to -93 (4th ed. 2019); 15 Virginia Practice Series: Workers' Compensation, *supra* note 1, § 20:6, at 203-06.